# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| SVETLANA LAMON, Derivatively on Behalf of WOLFSPEED, INC., | Case No. 1:25-CV-00298 |
| Plaintiff, | |
| THOMAS H. WERNER, GREGG A. LOWE, NEILL P. REYNOLDS, DARREN R. JACKSON, GLENDA DORCHAK, JOHN C. HODGE, CLYDE R. HOSEIN, DUY-LOAN T. LE, JOHN B. REPLOGLE, MARVIN A. RILEY, and STACY J. SMITH, | **JURY TRIAL DEMANDED** |
| Defendants, | |
| and | |
| WOLFSPEED, INC., | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Svetlana Lamon ("Plaintiff"), by and through her undersigned counsel, derivatively on behalf of Wolfspeed, Inc. ("Wolfspeed" or the "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon her personal knowledge as to herself and her own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by the Company with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst

reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action brought in the right, and for the benefit, of the Company against certain of its officers and directors seeking to remedy the Individual Defendants' (defined below) violations of state and federal law and have caused substantial harm to the Company.

2.     The alleged misrepresentations in this case focus on Wolfspeed's Mohawk Valley fabrication facility. In pertinent part, the Individual Defendants (defined below) provided the public with revenue projections that depended on the Mohawk Valley fabrication facility ramping its production to meet and/or exceed demand for its 200mm wafer product.

3.     The Individual Defendants provided these overwhelmingly positive statements to investors while, at the same time, misrepresenting and/or concealing material adverse facts concerning the true state of Wolfspeed's growth potential and, in particular, the operational status and profitability of the Mohawk Valley fabrication facility. First, to meet its publicly stated projections, the Company would have to cancel or otherwise indefinitely suspend planned future projects such as the facility in Saarland, Germany. Second, the Company would have to terminate a significant portion of its workforce (approximately 20%) and shutter the Durham fabrication facility.

2

4. On November 6, 2024, Wolfspeed announced its financial results for the first quarter of fiscal year 2025 and unveiled guidance for the second quarter well below expectations. While the Individual Defendants had repeatedly claimed that 20% utilization of the Mohawk Valley fabrication facility would result in $100 million revenue out of the facility, the Individual Defendants now guided to a range 30% to 50% below that mark. The Company attributed its results and lowered guidance to "demand … ramp[ing] more slowly than we originally anticipated" as "EV customers revise their launch time lines as the market works though this transition period."

5. Investors and analysts reacted immediately to Wolfspeed's revelation. The price of Wolfspeed's common stock declined dramatically. From a closing market price of $13.71 per share on November 6, 2024, Wolfspeed's stock price fell to $8.33 per share on November 7, 2024, a decline of about 39.24% in the span of just a single day.

## JURISDICTION

6. This Court is the sole and exclusive forum for this derivative action, as required by Article IX, Section 10 of the Company's bylaws:

(a) To the fullest extent provided by law, unless the Corporation consents in writing to the selection of an alternative forum, the sole and exclusive forum for all litigation relating to the internal affairs of the Corporation, including without limitation (i) any derivative action or proceeding brought on behalf of the Corporation, (ii) any action asserting a claim of breach of a fiduciary duty owed by any director, officer or other employee of the Corporation to the Corporation or the shareholders of the Corporation, (iii) any action asserting a claim arising pursuant to any provision of the Act, the Articles of Incorporation or these Bylaws, (iv) any action to interpret, apply, enforce or determine the validity of the Corporation's articles of incorporation or these bylaws, or (v) any action asserting a claim governed by the internal affairs doctrine, shall be the state courts of North Carolina, or if such courts lack

3

jurisdiction, a federal court located within the State of North Carolina, in all cases subject to the court's having personal jurisdiction over the indispensable parties named as defendants. Any such action filed in a North Carolina state court shall be designated by the party filing the action as a mandatory complex business case pursuant to Section 7A-45.4 of the North Carolina General Statutes. In any such action where the Act specifies the division or county wherein the action must be brought, the action shall be brought in such division or county.

7.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9). This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

8.      This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

9.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because: (i) one or more of the defendants either resides in or maintains executive offices in this District; (ii) a substantial portion of the transactions and wrongs complained of herein, including defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to the Company, occurred in this District; (iii) defendants have received substantial compensation in this District by

4

doing business here and engaging in numerous activities that had an effect in this District; and (iv) defendants have otherwise purposefully availed themselves of this District, issuing false statements in this District, maintaining offices in this District, and otherwise doing business in this District.

10.     In connection with the acts, transactions, and conduct alleged herein, the Individual Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

**Plaintiff**

11.     Plaintiff is, and was at all relevant times, a shareholder of the Company. Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

**Nominal Defendant**

12.     ***Nominal Defendant Wolfspeed*** is a North Carolina corporation with its principal executive offices located at 4600 Silicon Drive, Durham, NC 27703.  During the Class Period, the Company's common stock traded on the New York Stock Exchange (the "NYSE") under the symbol "WOLF."

5

**Director Defendants**

13.     **Defendant Gregg A. Lowe** ("Lowe") was, at all relevant times, the President, Chief Executive Officer ("CEO"), and Director of Wolfspeed until his resignation in November 2024.

14.     **Defendant Thomas H. Werner** ("Werner") has served as a director of the Company since 2006 and is the Company's Executive Chair.

15.     **Defendant Darren R. Jackson** ("Jackson") has served as a director of the Company since May 2016. Defendant Jackson also serves as a member of the Audit Committee.

16.     **Defendant Glenda Dorchak** ("Dorchak") has served as a director of the Company since January 2020. Defendant Dorchak also serves as a member of the Governance and Nominations Committee and the Compensation Committee.

17.     **Defendant John C. Hodge** ("Hodge") has served as a director of the Company since October 2018. Defendant Hodge also serves as a member of the Audit Committee.

18.     **Defendant Clyde R. Hosein** ("Hosein") served as a director of the Company from 2005 to December 2024.

19.     **Defendant Duy-Loan T. Le** ("Le") has served as a director of the Company since October 2018. Defendant Le also serves as a member of the Governance and Nominations Committee.

20.     **Defendant John B. Replogle** ("Replogle") served as a director of the Company from 2014 to December 2024.

21.     **Defendant Marvin A. Riley** ("Riley") has served as a director of the Company since January 2021. Defendant Riley also serves as a member of the Compensation Committee.

22.     **Defendant Stacy J. Smith** ("Smith") has served as a director of the Company since January 2023. Defendant Smith also serves as a member of the Governance and Nominations Committee.

23.     The above-named defendants are collectively referred to herein as the "Director Defendants."

**Officer Defendants**

24.     **Defendant Neill P. Reynolds** ("Reynolds") was, at all relevant times, the Executive Vice President and Chief Financial Officer ("CFO") of Wolfspeed.

25.     Defendant Reynolds along with Defendant Lowe are collectively referred to herein as the "Officer Defendants."

26.     The Director Defendants along with the Officer Defendants are collectively referred to herein as the "Individual Defendants."

**SUBSTANTIVE ALLEGATIONS**

**Background**

27.     Wolfspeed is a global semiconductor company focused on silicon carbide materials and the fabrication of devices for power applications. Wolfspeed largely targets

7

its products toward the electric vehicle and industrial and energy sectors through its fabrication facilities in Mohawk Valley, New York and Durham, North Carolina.

**MATERIALLY FALSE AND/OR MISLEADING STATEMENTS**

28.     On August 16, 2023, an earnings call was held which corresponded to the Company's fourth quarter fiscal year 2023 results.   In pertinent part, Defendant Lowe discussed the ramp of the Company's fabrication facility (or "Fab") in Mohawk Valley as follows:

> Our Mohawk Valley Fab, which is the world's largest fully automated 200-millimeter silicon carbide fab began shipping product and contributing revenue. Last October, we outlined our plans to construct the world's largest state-of-the-art greenfield silicon carbide footprint. Since then, we've secured $5 billion of the capital necessary to achieve these goals, allowing us to finish out the fit out of Mohawk Valley, expand our materials capacity at Durham, and break ground on the world's largest 200-millimeter silicon carbide materials facility, the JP and Siler City, North Carolina.
>
> ***
>
> As it relates to Mohawk Valley and our device business, we have continued our ramp-up efforts and recorded approximately $1 million in device revenue out of the fab in fiscal Q4. Silicon carbide is a complex technology that's very difficult to master, and I'm proud of how our team has worked tirelessly to get this ramping device production in a brand-new, highly automated fab. We still have some work to do at Mohawk Valley as we scale device production and expect a modest increase in device revenues in the first half of fiscal 2024 with a steeper increase in revenue beginning in the second half of 2024.
>
> ***
>
> From a device perspective, we are seeing continued strength across our end markets, and we secured approximately $1.6 billion in design-ins for fiscal Q4. For fiscal 2023, design-ins totaled approximately $8.3 billion. And the cumulative total now stands in excess of $19 billion secured in the last 4 years. Our customer wins to date give us the confidence in the growth of our

8

addressable market and our ability to capture meaningful share of the device market between now and the end of the decade. More than anything, we're proud of our role in building greater awareness for silicon carbide. At the same time, the world is realizing the importance of the global semiconductor industry. The secular trends that are driving the adoption of silicon carbide have started to receive widespread public recognition as a truly game-changing technology in the power semiconductor space.

29. During the call, Defendant Reynolds provided more discrete details for the Mohawk Valley facility's trajectory, adding, in pertinent part:

As Gregg mentioned, we recognized $1 million in revenue from Mohawk Valley, while we are still aligned on previous expectations that we will reach 20% utilization out of Mohawk Valley by the end of fiscal 2024, it is important to note that it will be the second half of the calendar year 2024 before we see $100 million of quarterly revenue from the fab that the 20% utilization would represent. This accounts for the time between fab starts and shipments to our customers.

\*\*\*

As we've said in the past, the main driver of future revenue growth for power devices will be the incremental revenue contribution from Mohawk Valley.

30. A question-and-answer segment followed the prepared remarks, during which Defendants Lowe and Reynolds confidently reiterated the purported potential of Mohawk Valley, pertinent in response to the following inquiry:

**Piper Sandler & Co. Analyst:** Greg, I've got 1 for you. It's pretty clear that your future growth of the company lies with Mohawk Valley, so maybe you could talk about what you want to see happen in that fab to ramp that facility, you did $1 million. I think you were pretty clear in the call, you did $1 million last quarter, but you're talking about a $100 million achievement in the second half of 2024. Would that be towards the beginning of second half or towards the end of -- in other words, are we talking March? Or are we talking the June quarter for you to get to $100 million? And then more importantly, what do you need to see at the fab to get to that kind of a number?

9

**Gregg A. Lowe:** Yes. Thanks a lot, Harsh. A couple of things. So first off, in ramping that fab, we obviously have to ramp the materials flowing into that fab. I'll give you a brief update on that. The 200-millimeter crystal growth operation and Building 10 is well on its way in producing excellent quality material, which is translating into very nice -- excellent defect density wafers. Epi, a 200-millimeter is also excellent, and we are ramping that as we speak. And now we're obviously shipping products from the Mohawk Valley fab.

We have 3 products that are currently fully qualified in 200-millimeter for at Mohawk Valley Fab and we have 8 additional products that now pass all reliability testing and are working through the final end of some qualification for that. So that's all in really great shape. Now as we ramp this up, obviously, the $1 million of revenue in fab is capable of $2 billion is kind of early innings of ramping. As we ramp the fab, we'll be dialing in the processes and dialing in the equipment, which will take our yields up to entitlement yield. And as we ramp the fab, that will absolutely may happen. So what I would say is the fact that we're ramping a new 200-millimeter crystal. The fact that the crystal quality is excellent and the quality of defectivity on the wafer is excellent. Combine that with EPIs and really good shape from a process standpoint. And we've got a fab that has 3 qualified devices this early and 8 that have passed reliability gives me great confidence that we're going to be -- that it's fab is going to deliver in the entire supply chain that's going to deliver everything that we expected out of this. In terms of the ramp of the production and the expectation for the amount of revenue. Our expectation is that we'll be at 20% utilization by the June quarter. and I'll let Neil translate that into what you can expect out of revenue.

**Neill P. Reynolds:** Yes. And just remember, Harsh, as you think about utilization, that's the time frame from the time you actually load the fab -- wafers into the fab from a utilization perspective until you freeze the wafers, put them to the back end and finally shipping to the customer. So somewhat of a delay you'd expect from the time to achieve utilization level. So as we get the 20% towards the end of the year, you wouldn't expect to see the revenue translation of that, as we get a 20% utilization, say, by the June quarter, we wouldn't expect a revenue translation of EPI, the equivalent of $100 million to be sometime after that sometime in the second half of calendar '24. So first half of calendar fiscal '25 as you think about that time frame. So the sort of timing of the revenue and of the Fab is we did about $1 million or so last quarter. We'll see a bit of a tick up here in Q1, a modest pickup, I think, again, in 2Q and then a steeper ramp as you get to the back half of the fiscal year into the March and June quarter, and then we should be on our way from there.

Case 1:25-cv-00298-UA-LPA    Document 1    Filed 04/21/25    Page 10 of 106

31.     On September 8, 2023, the Company filed its 2023 Proxy Statement on Schedule 14A with the SEC, solicited by Defendants Dorchas, Hodge, Hosein, Jackson, Le, Lowe, Replogle, Riley, Smith, and Werner.   The 2023 Proxy Statement solicited shareholder votes in favor of, *inter alia*: (i) re-election of the foregoing directors to the Board; and (ii) approval of the 2023 long-term incentive compensation plan. The 2023 Proxy Statement, the following statements were made:

Fiscal 2023 Business Highlights.

• Year-over-year revenue increased by $175.7 million to $921.9 million.

• Gross margin decreased to 30.3% from 33.4%. Gross profit increased to $279.5 million from $249.3 million.

• Combined cash, cash equivalents and short-term investments increased to $2,954.9 million at June 25, 2023 from $1,198.8 million at June 26, 2022.

• Design-ins were $8.3 billion in fiscal 2023 compared to $6.4 billion in fiscal 2022.

We have made significant progress across all operational areas of the business and will continue to focus on the enhanced delivery of financial performance progress in fiscal 2024. The Mohawk Valley Fab, which is the world's largest fully-automated 200 millimeter fab, began shipping product and contributed approximately $1 million of revenue in fiscal Q4.

***

**Board's Role in Risk Oversight**

The Board, acting itself or through one or more of its committees, has general oversight responsibility for corporate risk management, including oversight of management's implementation of risk management practices. While the Board is responsible for risk oversight, management is ultimately responsible for assessing and managing our risk exposures. The Board directly oversees

management's assessment, mitigation efforts and monitoring of strategic and operational risks, such as those relating to competitive dynamics, market trends and developments in the Company's industry, changes in economic conditions and cybersecurity. Senior management regularly updates business plans for each of the Company's product lines, including an assessment of strategic and operational risks and responses to identified risks, and members of the Board and senior management meet annually to review these plans. In addition, senior management reports to the Board at each quarterly Board meeting on progress made against these strategic plans, including an update on changes in risk exposure and management's responses to the changes.

The Board also fulfills its risk oversight role through its committees. Specifically, the Audit Committee charter assigns it the responsibility to review periodically with management, the internal auditors, and the independent auditors the Company's significant financial risk exposures, including the Company's policies with respect to risk assessment and Company-wide risk management, and to assess the steps management has taken to monitor and control such exposures. The Audit Committee regularly discusses material risks and exposures with our independent registered public accounting firm and receives reports from our accounting and internal audit management personnel regarding such risks and exposures and how management has attempted to minimize the exposures. The Audit Committee's primary focus is financial risk, including our internal control over financial reporting. Particular areas of focus of the Audit Committee include risks associated with taxes, liquidity, investments, information technology security, material litigation, and compliance. The Company has a Chief Compliance Officer who reports directly to our General Counsel and who attends Audit Committee meetings. The Chief Compliance Officer is responsible for the Company's global corporate compliance program, consisting of legal and regulatory policies and procedures, that includes employee training on how to implement and comply with these policies and procedures.

32.     Under the direction and watch of the Director Defendants, the 2023 Proxy Statement was materially false and misleading because the above-referenced statements touted positive statements regarding the Company's financial outlook and risk oversight function, yet failed to disclose material adverse facts concerning the true state of Wolfspeed's growth potential and, in particular, the operational status and profitability of

the Mohawk Valley fabrication facility which was known, or should have been known to the Director Defendants in the exercise of prudent business judgment. As such, the foregoing statements in the 2023 Proxy Statement were half-truths, meaning that the Director Defendants were required to (yet failed to) include all additional information necessary to make the statements not misleading. *See* 17 C.F.R. § 240.12b-20.

33. As a result of the Director Defendants causing the 2023 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to re-elect certain directors to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company.

34. On January 31, 2024, the Company reported its second quarter results for fiscal year 2024. During the corresponding earnings call, the importance of the Mohawk Valley facility's ramp to the Company's success and progress thus far was detailed, stating, in pertinent part, the following:

> The Mohawk Valley Fab delivered improved performance and is on track to achieve 20% utilization in the June quarter. From a 200-millimeter substrate perspective, there is now ample runway to not only meet but exceed our original utilization target from Building 10 on the Durham campus as we're consistently producing high-quality, high-yielding 200-millimeter wafers out of this facility. The additional flexibility will be important as we begin producing substrates in the latter half of this year at The JP. Overall, I'm confident about our execution of our near-term operational goals and optimistic around our long-term financial prospects.
>
> Showing our unwavering focus on execution, the second quarter continued the solid momentum from the first quarter. We've said time and time again that all roads lead to Mohawk Valley, and this past quarter was no exception. The fab contributed approximately $12 million to our quarterly revenue, roughly triple last quarter's levels and at the midpoint of our guidance. I spent a lot of time at Mohawk Valley this past quarter and witnessed the dedication

13

of our team firsthand, who, along with our incredible tool suppliers are working around the clock on tool optimization activities related to this first of its kind grant.

Wolfspeed at its core is an innovative company, full of problem solvers, and I'm very grateful to the entire team that we are head sound and focused on execution at this fab. To give you a sense for the progress at Mohawk Valley, so far, we've qualified over a dozen customer parts, including 2 of our most complicated automotive devices, as well as the largest device we are currently producing at the facility. This gives us more than enough qualified parts to achieve our 20% utilization goal, and we expect to continue to qualify more parts between now and the end of June, further supporting the Mohawk Valley revenue ramp.

***

As a reminder, a design-in represents business we've been awarded. And the conversion to design win happens when the customer places production orders for 20% of the first year production volume. In other words, the design-win indicates that the customer is beginning to ramp their production with our devices. We achieved $2.1 billion in design-ins this quarter, marking our third highest quarter on record, which clearly indicates continuing and growing robust demand for silicon carbide.

More importantly, we posted a record of $2.9 billion of design-wins, which were heavily weighted towards EVs and included 28 different electric vehicle models. This diverse customer base across the global electric vehicle industry, with multiple OEMs and Tier 1s, gives us confidence to continue with our expansion plan and further illustrates why we believe our supply will be continuing to work to catch up with demand over the next few years. And these design-wins are just the beginning.

Over the next 5 years, based on our current design-ins, the number of EVs leveraging Wolfspeed devices will increase to nearly 120 different models across 30 different OEMs. This represents a significant growth from the small number of vehicles on the road using our silicon carbide devices today, and demonstrates the opportunity ahead for us. As we continue to pioneer 200-millimeter silicon carbide and embark on our unprecedented greenfield capacity expansion plans, we maintain conviction in our strategy. It is exciting to see what is on the horizon, and we look forward to continuing this promising momentum, particularly at Mohawk Valley, throughout the second half of this fiscal year and beyond.

\*\*\*

During the quarter, we generated record power revenue of $108 million, driven largely by the $12 million of contribution from Mohawk Valley and strong demand we see for our products. Looking at the power device revenue performance in more depth, we saw a sharp increase in EV revenue quarter-over-quarter, fueled by the additional EV device products shipping out of Mohawk Valley. However, this was partially offset by lower demand and persistent weakness in our industrial and energy markets, particularly in China and across Asia.

\*\*\*

We know from the more than 30 years of experience of working with this material that the significant ramp required to create high-quality materials consistently at scale gives us a competitive advantage today and for the foreseeable future, especially as we begin producing 200-millimeter at The JP. The demand for silicon carbide remains significant, underscored by the 2 recent announced expansions of long-term supply agreements with existing customers. We expect to remain an important partner to other silicon carbide device manufacturers through the end of this decade. And we believe our leadership in materials provides a strong foundation for us to continue to grow our device business.

We are working closely across a diverse set of customers, which gives us good visibility into how the markets are evolving and where we can capitalize on the opportunity. Being the leader in silicon carbide, a truly transformative technology, is no easy task. And we are executing on this opportunity with efficiency, purposefulness and thoughtfulness. We look forward to bringing this vision into reality and generating long-term value for all stakeholders.

35.     The question-and-answer segment of the call followed, during which

Defendants Lowe and Reynolds spoke further to their confidence in the current and guided

progress in Mohawk Valley's ramp, pertinently in response to the following inquiries:

**Goldman Sachs Group Analyst:** I know you get asked this every quarter, but it sounds like the tone, the confidence, some of the data points you're throwing out there, Gregg, are as positive-sounding as we heard about the

15

internal operationals [sic]. So given Building 10, it seems like you're ahead of plan. What is the potential for Mohawk to maybe pull ahead in the ramp to 20%? I know you're super confident in being able to hit it. But how do you potentially see upside to any of these medium-term targets? I think you've talked about $100 million of revenue from that facility by the December quarter.

So are there still internal bottlenecks operationally keeping you from accelerating? Or are there customer eval issues? Wondering, as you think about the upstream sort of not being as much of a limiting factor, how you could potentially maybe translate that to moving Mohawk Valley a little bit faster.

**Gregg A. Lowe:** Thanks a lot, Brian. So first off, the team has done -- the team up in Mohawk Valley combined with several -- the teams from Durham that have gone up to Mohawk Valley, has done an incredible job of relieving bottlenecks and fine-tuning the processes, et cetera. So very pleased with the progress we're making, still have a lot to do. But obviously, tripling the revenue and then doubling it again next quarter is fantastic. We feel great about where we're at with Building 10, obviously, now having an ability to support a greater ramp of 25% is fantastic as well. But as I said in the prepared remarks, we're going to keep the pace of the fab itself at the pace of 20% utilization in the June quarter, $100 million of revenue in the December quarter. We feel real good about that. But again, from a longer-term perspective, the ability to get more out of the facilities on the Durham campus in terms of supplying Mohawk Valley, it gives us really good confidence in being able to take that number up higher out in time.

\*\*\*

**JP Morgan Chase & Co Analyst:** I guess, Gregg, you did mention the design-in pipeline, which continues to remain quite robust on the EV front. I was just wondering, I mean, what are you seeing change in terms of conversion of design-ins to design-wins, obviously, with the design-ins picking up in pace and potentially the launch of these sort of vehicles also coming more closer? Are you seeing a bit of any changes in the conversion rates of these design-ins to design-wins eventually? And just any color there that you can share will be helpful. And I have a quick follow-up after that.

**Gregg A. Lowe:** Sure. Good question. So this past quarter, we had a record conversion of $2.9 billion to design-win that represented, as I mentioned, there's 28 different unique electric vehicle models that are in there and a

whole bunch of other products as well, including a number of industrial and energy applications. So we're really happy and very -- quite frankly, the design-win conversion we just had is quite a stunning number of $2.9 billion. So I feel real good about that conversion. And then the $2.1 billion of design-in gives us confidence that customers are still very excited about our technology and our capability.

***

**William Blair & Company Analyst:** Well, congratulations. My follow-up question, so it's similar to what Brian asked you but with a slight nuance. So if I look at what Building 10 is outputting in terms of wafer starts and what you're pulling down on that in Mohawk Valley, my calculation would be that you will have an inventory of wafers over $200 million by June, assuming that the $25 million at midpoint and maybe a $50 million to $60 million or $55 million in June, my estimates on that. So my question is, as you look through the rest of the year, clearly, that gives you some guide in terms of Siler City ramp from a buffer perspective. But what are the -- is it missy kind of getting the second of a kind tools? What are the gating factors as you think about moving around that utilization to debottleneck and capture either more or less in the back half of this year and next?

**Gregg A. Lowe:** Thanks for the question, Jed. And I'll kind of talk first about my perspective on this and then hand it over to Neill. So you're exactly right that we are shipping out of the Durham facilities up to Mohawk Valley and obviously, we have inventory building up there in anticipation of the ramp. So no question about that as we're trying to get ahead of things. So that's actually good news. And the way that we have the overhead track system and the storage up there it makes it perfect for that situation, number one.

Probably the more important aspect as it relates to buffering for The JP is the ability to ship up to 25%. Right now, we have very high confidence to 25% utilization out of the Durham campus. So that obviously gives us really good confidence. At this point, in the fab itself, about 75% of the tools have second of a kind tools, and we anticipate that the vast majority of the tools will have second of a kind tools by the June quarter of this year. So that will help debottleneck things because if a tool goes down, it basically stops production if there's not a second of a kind tool. So that's kind of what's happening there. Maybe I'll hand it over to Neill, if you want to add any additional color.

**Neill P. Reynolds:** Yes. So I think, Jed, what that means that there's no real change to the outlook right now. The key driver here, as we have talked about,

17

is just ramping the revenue to $100 million by December quarter coming out of Mohawk Valley. And clearly, the inventory that we see coming out of Durham and Building 10 gives us good strength and good confidence that we'll have an available number of substrates to go drive that revenue through. So it will really be about how quickly can we get that throughput through the fab and out to customers over that period.

Now one other thing I'll mention is we also mentioned on the call here is we should be able to see Durham go from 20% to 25% equivalent utilization by December or towards the end of the year. So what that means is we'll be able to go above the $100 million a quarter as you get out into kind of that March, June 2025 time frame. So -- and then when The JP starts making meaningful substrate deliveries to Mohawk Valley, probably in the back half of calendar '25, we should have a nice glide path of substrates to support us out through that period. So we feel like, obviously, the demand continues to remain strong based on the customers that we have in front of us and it really just be about ramping, delivering substrates to the fab and continuing to drive productivity and output there.

*** 

**JP Morgan Chase & Co Analyst:** I guess my follow-up was more on the industrial weakness that you're seeing and just trying to think about how to sort of extrapolate that to thinking about the June quarter as well. You are indicating you take a step down on power devices revenue related to that industrial weakness that you're seeing. But how are you thinking about how long that continues in terms of weakness? Is there an incremental step down in relation to that weakness you're seeing based on your current visibility? Just trying to get a sense of as Mohawk ramps, how do we think about sort of the offsets to that?

**Gregg A. Lowe:** So first off, industrial is definitely weak, as we had mentioned last quarter as well. And it is mainly driven by Asia and China, but it's weak across Europe and U.S. as well. And it's hard to tell when things are going to get better. But from a planning perspective, we're not anticipating it getting better this year, this calendar year. So we're just assuming it's going to be where it's at.

Now the industrial business is a really good business for us, and it will come back. And what we're doing in the meantime is we're ramping Mohawk Valley, which is almost targeted right now at automotive customers. So we will be ramping Mohawk Valley and driving that up. We're converting as

18

much as practical out of Durham to supply for the automotive customers as well, but we are limited on the Durham footprint from that perspective.

But the good news is eventually, and we've all seen the movie, the industrial business will pick back up. And when it does pick back up, we will largely be an automotive output out of Mohawk Valley and giving us room then in the Durham facility to continue ramping when the industrial business picks back up. And again, we've gotten a lot of design-ins and a lot of design-wins there. It will come back up. That's a great business for us. We love the customers in that space. And we'll have ability out of the Durham facilities to handle that.

36.     On March 4, 2024, Wolfspeed presented at Morgan Stanley's Technology, Media & Telecom Conference 2024.  In pertinent part, Defendant Lowe again confidently reiterated their confidence in the demand landscape, responding to the moderator's questions as follows:

**Morgan Stanley Executive Director:** And the bottom line here is you're quite confident hitting the milestones for Mohawk Valley for the rest of the year?

**Gregg A. Lowe:** Yes, yes I am.

**Morgan Stanley Executive Director:** So maybe if we could talk to the demand side a little bit. I think you talked about 28 OEM wins. Obviously, you talked about the pipeline numbers. Those are really big numbers. And I guess, how do you think of those in terms of timing that they go to production timing that you can make announcements around those kind of exclusive wins that you have?

**Gregg A. Lowe:** We sort of have a funnel, so to speak, taking the opportunity that we have, the design ins that we have, the design wins that we have and then what the revenue is going to be. And at each of those stages, we take a pretty decent haircut just anticipating that the customer might not make 1 million cars, maybe it's going to be 500,000, or they're taking a brand from a run rate of 100,000 cars to 500,000 cars, and is that really viable. So we take haircuts on that sort of stuff.

19

We do the same thing with our China customers. We have great customers in China, where we've got pretty decent exposure to the auto industry there. But it's sort of in the country's interest to try to foster internal capabilities. So we make an assumption that more of that is going to possibly go away. Despite taking all of those sort of judgments, we still have a demand scenario that is substantially higher than our supply for the foreseeable future.

I think there's going to be lots of fits and starts. I think you're going to see surprising winners. You're going to see surprising losers. Like if you look at the top 10 automobile companies in the world today, 2 are Chinese despite the fact that China is the world's largest market for cars. And by the way, they occupy #8 and 10. If you look at battery electric vehicles, they're 5 of the top 10, including 1, 3 and 5. So most likely, if you look at the top 10 car companies in 2030 and you compare it back to 2020, I think there's 5 new names. And maybe they're not all Chinese, but probably one of them will be. Probably one of them is going to be Tesla. There's going to be a lot of change in churn in the auto industry. This is the biggest disruption in the history of the car. Brakes and traction control and power steering and all of that has -- was nothing compared to what's happening.

**Morgan Stanley Executive Director:** Yes. And there's definitely the sense that the momentum on EVs has shifted to China a little bit. And in the U.S. and in Europe, you have a lot of companies that are dedicated to EV, spending a lot on EV, and this is where our auto team gets a little bit cautious of like if they focus on internal combustion, the stocks are materially cheaper, right, because they're not making these big investments and questioning some of those investments. So I guess, how do you think -- and again, that's one view. I'm not saying that's right, but how do you guys think about that? And does it matter if we see programs here and there that sort of shift back towards…

**Gregg A. Lowe:** First off, it's not going to matter to us because the supply is not meeting the demand right now, so we'll just be able to shift it. There might be a quarter where we're running with this one part and we need to shift it to a different part. We have a lot of fungibility though, so we probably are not going to see that. But I would say a couple of things.

First off, you heard me say it earlier. This is the iPhone moment for the Western world. And they're either going to shine or they're going to go away. And I don't think this is a stoppable reversible pattern. Second, most Western car companies got rid of all the people developing anything internal combustion engine technology development wise. So new engine technology, new -- any of this kind of stuff, they stopped developing that 4

or 5 years ago. And it -- you're not going to have the do-over moment, I don't think, for this. They may produce those same cars for a little bit longer, but they're not going to meet any of the EPA guidelines or any of that kind of stuff. So there's going to be a lot of issues. And like I said, they stopped development of that technology and I just don't see a do over possible at all.

Yes. It's going to be highly disruptive. Winners, losers. Forecasts are going to be changing. It doesn't really matter to us for the foreseeable future.

37.     On May 1, 2024, Wolfspeed published its results for the third quarter of fiscal year 2024.  In the corresponding earnings call, Defendants Lowe and Reynolds spoke to the current state of the Company and the alleged misperception by its investors, stating, in pertinent part:

First, we believe the market is not fairly valuing the company, consistent with the technology and the business we have built or the strategic potential of the business. The management team and the Board of Directors are focused on this disconnect and routinely consider alternatives to enhance value for shareholders.

Second, driving better financial performance and value for shareholders by delivering on our near-term operational commitments for fiscal 2024 and 2025 is at the core of every decision we make. We are laser-focused on increasing the utilization at Mohawk Valley, and as I'll talk about in a few minutes, we are making solid progress there. We are also focused on bringing The JP online, where we are, likewise, making solid progress on that project.

Third, our operational road map provides sufficient time to focus all of our efforts by making sure Mohawk Valley and the JP are on track before we move on to new project, which is not only good for investors, but for our customers who are also counting on us to meet our commitments. At this time, there are not any additional greenfield projects scheduled to launch until we demonstrate further progress on our existing project, and we expect to significantly reduce CapEx for fiscal 2025, ahead of receiving any grants or funding from the U.S. government.

Finally, we are deliberately and effectively allocating capital

                                        ***

We made strong progress at Mohawk Valley in the third quarter, more than doubling our revenue and delivering $28 million of product to customers from this fab. We are on track to achieve 20% wafer start utilization in Mohawk Valley by June of this year. And to give you a sense of the progress we're making as of April, we are already at more than 16% utilization based on wafer starts per week, making us extremely confident on our ability to achieve our target in June of 2024.

\*\*\*

As we mentioned last quarter, we continue to be a key supplier of silicon carbide substrates to the broader market, as evidenced by the 2 supply extensions that we announced in January. Our LTAs underscore the importance of our role as the leading provider of high-quality 150-millimeter substrates to the market, and we will continue to be an important partner to our customers in the years to come.

\*\*\*

While Mohawk Valley, which currently services almost entirely EV customers, is something the I&E market or industrial and energy market remains challenged and remains weaker than our original expectations, primarily due to inventory buildups across many end market channels predominantly in the Asian markets.

We are responding by shifting I&E capacity both in Durham and Mohawk Valley towards EV. Our ability to shift our production from I&E to EV speaks to the flexibility that our business model provides us. However, this end market shift and change in product mix will have a short-term headwind on our gross margins, but it will position us well for fiscal 2025, as we could see the start of a recovery for the I&E demand at some point during this period.

Unlike I&E, we continue to see a ramp of EVs that have adopted our silicon carbide devices. While this is a disruptive time in industry, and we continue to see OEMs adjusting and modifying their near-term EV production plans, we remain substantially supply constrained for our silicon carbide devices. As demand remains well above our current supply, we can be nimble and shift much of our supply to other customers to accommodate for these near-term changes.

22

Underscoring this continued EV demand is our strong design-in and design-win performance this quarter. As a reminder, a design-in represents business we've been awarded which converts to a design-win once we begin ramping into initial production. This quarter, we achieved approximately $2.8 billion of design-ins, about 80% of which was for EV applications, marking our second highest total on record and totaling over $7 billion of design-ins for fiscal 2024.

***

We remain confident in our long-range financial targets. As the underlying economics, we are seeing so far for Mohawk Valley and Building 10 demonstrate that our purpose-built, vertically integrated greenfield approach to capacity expansion will generate strong revenue and profitability.

In combination with the JP, Mohawk Valley will be able to produce more than $2 billion of device revenue, in addition to the $400 million of device capacity currently installed in our Durham device app. In addition, with the JP online, we have the potential to grow the material substrate business to greater than $600 million. Lastly, short-term revenue and gross margins are being impacted by slower industrial and energy markets.

In the short term, we are pivoting our available capacity to EV products, where EV product demand continues to outstrip our available capacity to serve that demand. The outcome of this will be more muted revenue growth and low gross margin for the next few quarters. As Gregg mentioned earlier, it positions us for any potential recovery in I&E, most importantly, it does not impact our longer-term plans to achieve our revenue and EBITDA targets.

We believe that it will be at least the second half of this calendar year before we see inventory levels return to normal. But as we said last quarter, much of the product we had already produced and slated to ship at the match elsewhere in our pipeline. And we are continuing to work to find the best match for that inventory now.

38.    During the question-and-answer segment of the call, Defendants Lowe and Reynolds fielded questions relating to the electronic vehicle landscape and their automotive demand pipeline, particularly in the following pertinent discussion:

23

**William Blair & Company Analyst:** Thanks. I just wanted to dig into, Gregg, your comments on demand, which seems strong for you in EV. Just in the materials business, with that business coming down so much. So if I kind of take your guide on a quarterly basis, it's come down about $40 million per quarter. Why aren't materials ramping complement to that? Because I would assume that, that opens up the 150-millimeter wafers to sell to other customers.

**Neill P. Reynolds:** Sorry, Jed. So in terms of the -- how we think about that, right now, the end market demand for automotive in terms of EV customers. So there's a lot of changes that Gregg talked about in terms of the OEM landscape. The amount of demand still outstrips our supply. So it's really important for us to continue to take as much capacity as we can serve those customers. In the meantime, we'll continue to drive our materials business. As you know, we've got a lot of long-term agreements there that underpin our revenue for a long time. And I think that the $99 -- $90 million to $95 million per quarter will continue to service that market, I think, in terms of how it's kind of laid out today. I think it's very important that we continue to service our automotive customers at this time. And we're going to continue to understand…

**William Blair & Company Analyst:** Neill, maybe I didn't ask the question clearly, but it's $40 million coming out of Durham on the devices side, where you're supplying the 150-millimeter wafers internally. Why wouldn't you be able to see a $12 million increase in the materials business?

**Gregg A. Lowe:** Yes. So maybe I'll take a crack at that. I don't think I understood that could be your question. So a couple of things. Obviously, we have automotive demand that is higher than our current supply. So transitioning that capability from I&E to automotive is a very important customer satisfaction item that we're focused on. The automotive devices are larger than the industrial products. And substantially, most of the industrial products are sold in packaged or module form. And they get the exact opposite for automotive. For automotive substantially, most of the product that we sell is in die form. So we're not adding value, we're adding incremental revenue potential for the same amount of, I'll call it, silicon carbide millimeters [indiscernible].

So it's not a one-to-one trade-off when you move from an industrial part to an automotive part in the fab itself…

39.     On June 24, 2024, Wolfspeed announced that the "Mohawk Valley silicon carbide fab has reached 20% wafer start utilization, a critical step in the Company's efforts to meet the growing demand for silicon carbide power devices."  The Company additionally announced that its "Building 10 Materials facility [at Durham] has achieved its 200mm wafer production target to support approximately 25% wafter start utilization at the Mohawk Valley fab by the end of calendar year 2024."  Wolfspeed's "next utilization milestone for Mohawk Valley" was slated to be unveiled "during its fiscal Q4 2024 earnings call in August."

40.     On August 21, 2024, Wolfspeed unveiled their fourth quarter fiscal year 2024 results and conducted an associated earnings call.  During the call, Defendants Lowe and Reynolds spoke at length about their progress and forecasts as they continue to claim the market is undervaluing the company.  In pertinent part, they provided the following information:

> As we've discussed previously, our 200-millimeter device fab is currently producing solid results at lower costs than our Durham 150-millimeter fab while also presenting significant die cost advantages. This improved profitability gives us the confidence to accelerate the shift of our device fabrication to Mohawk Valley while we assess the timing of the closure of our 150-millimeter device fab.
>
> ***
>
> Crystal growth and substrate processing out of Building 10 in Durham continues to scale, and we expect to be able to support a 25% wafer start utilization at Mohawk Valley in the September quarter, 1 quarter ahead of plan. As a result of continued productivity improvements, we are also now expecting Building 10 to support 30% wafer start utilization at Mohawk Valley in the March quarter of 2025.

25

***

Lastly, as I outlined last quarter, the market is clearly not valuing the company consistent with our technology, the business we've built or the strategic potential of the business. In light of this disconnect, the management team and the Board of Directors routinely consider alternatives to enhance value for shareholders. Having laid out those points, let's move to the specifics of Wolfspeed's fourth quarter performance.

The Mohawk Valley Fab generated $41 million in revenue for the quarter, on the lower end of our estimated range, which was the result of an EV customer deferring delivery of several million dollars' worth of product. We expect to recognize this revenue in fiscal 2025 and believe we would have landed in line or slightly above the midpoint of our Mohawk Valley revenue guidance excluding this push-out.

We passed internal qualification for nearly all automotive powertrain products in late July and now have only a handful of customer qualifications left to complete, giving us the confidence that those products can be serviced out of Mohawk Valley sooner than we originally anticipated.

While the ramp of EVs is slower than previously projected and many companies in the semiconductor industry are still confronting automotive headwinds, our revenue in the EV market continues to be strong because we are just at the beginning of the ramp of our automotive business across several geographies.

Our EV revenue in the fourth quarter was up more than 100% year-over-year and is expected to be up approximately 300% year-on-year in fiscal Q1. We are in the very early stages of what might be the most significant transition in the history of the auto industry. This will create a very dynamic environment as the OEMs will continue to adjust their ramp programs across their EV product portfolio.

Our EV revenue has grown for 3 consecutive quarters despite a declining auto semiconductor market because some of the EV design-ins we've accumulated over the last 5 to 7 years are just beginning to ramp. We achieved an additional $2 billion in design-ins in fiscal Q4, bringing our fiscal 2024 total to over $9 billion of design-ins.

***

26

We generated $201 million of revenue for the quarter, slightly above the midpoint of our guidance and flat sequentially. We recognized power revenue of $105 million, driven largely by the contribution from Mohawk Valley but offset by continued weakness in industrial and energy markets. Mohawk Valley's $41 million contribution represents growth of 46% quarter-over-quarter and an exponential increase from the $1 million contribution 1 year ago.

We achieved $64 million of revenue from our Durham device fab, down approximately 40% year-over-year, driven by continued weakness in industrial and energy markets. We also recognized materials revenue of $96 million, above our expectations, driven by the continued strong execution of our materials operations team.

*** 

Moving on to our guidance for the first quarter of fiscal 2025. We target our revenue to be in the range of $185 million to $215 million. We target roughly $50 million to $60 million of this revenue to come from Mohawk Valley next quarter, up more than 34% from the prior quarter and up greater than $50 million year-over-year at the midpoint of our range versus the $4 million we achieved last year at this time.

41.     The question-and-answer portion of the call followed where Defendants

Lowe and Reynolds clarified their plan to shutter the Durham fabrication facility and their

confidence in absorbing that revenue through the Mohawk Valley facility, stating, in

pertinent part, the following:

**JPMorgan Chase & Co Analyst:** This is Joe Cardoso on for Samik Chatterjee. Just curious, like the potential closure of the Durham device fab would be quite a shift in strategy relative to prior closures. I think $400 million of revenue was coming from that footprint when it's fully loaded.

So just curious if you could just dive into that or flesh it out a bit more, what the exact thought process here is to close -- around closing that fab and take it out of the long-term model, and then maybe the second part of that question is, what does that imply for the existing footprint there in Durham?

27

**Gregg A. Lowe:** Thanks for the question. First, it was always the plan to ramp down 150-millimeter and transition to 200-millimeter. What's really made this decision very straightforward is the progress and productivity we're seeing across the entire 200-millimeter platform: output from Building 10 now able to support 30% wafer start utilization; yields in Mohawk Valley ahead of plan; the economics of Mohawk Valley substantially more compelling than Durham; and finally, we're on scheduled to ramp The JP and seeing great results from the initial crystal run.

So combine this with the fact that the industrial and energy business is down, starting this process of transitioning the fab when we're not swimming upstream against the whole bunch of demand from I&E certainly gives us breathing room to make this happen. The key decision though, was all about the progress and productivity that we see across 200-millimeter. We're super excited about that. It's actually quite an amazing accomplishment that the team has been able to do. And Neill, you can get into a little bit of detail, but that progress and productivity also gives us ability to absorb that revenue in our current footprint.

**Neill P. Reynolds:** So let me just break down a little bit just a bit of the capital efficiency that we're seeing. So one thing I talked about is kind of taking the CapEx level down from $1.2 billion to $1.4 billion during fiscal year 2025 and then dropping it down dramatically in fiscal year '26.

So I think as Gregg said, the facility spend being complete, we can really modulate our CapEx for tools going forward. And that facility will be -- the facilities costs will likely be complete by December of this year. So we plan these factories for great economies of scale, building up modularly, and we're starting to see the benefits of that as we start to exit that facility spend.

The second thing is our capital investment model is working as expected. So the good yields and the efficiency across the 200-millimeter supply chain is just resulting in a lower required amount of CapEx for each incremental dollar of revenue. So we're seeing some good performance there. So when you think about what that would mean longer term for the revenue, Joe, as you start to think about moving on beyond the Durham fab one day, that $200 million to $600 million of fiscal year 2026 CapEx could support 50% to 60% utilization out of Mohawk Valley.

So I think it's a real testament to the amount of revenue we can absorb through Mohawk Valley when you start making that trade from 150-millimeter to 200- millimeters. So I think here, in the medium term, if we go

down that path, I think Mohawk Valley will have significant capability to absorb a lot of that revenue. And of course, the trade-off from industrial and energy from 150 to 200 is actually a very, very good mix shift from that perspective.

So we believe that the Mohawk Valley fab will really be able to incorporate a lot of that revenue just mentioned, and we'll -- as we tighten up these plans and give more of an update, we'll let you know how that impacts the long-term model, but we're clearly bullish on the ability of Mohawk Valley to absorb that.

***

**TD Cowen Director:** I wanted to ask about the Mohawk Valley ramp and time lines to revenue. Is the right rule of thumb still when you reach those utilization levels, you get revenue, I think it's roughly 2 to 3 quarters later? Because that would imply that you're, in the fiscal third quarter of 2025, a number comfortably above $100 million out of Mohawk. And then maybe as a follow-on to that question, what's the time line to get to the 30% beyond that? And how does that coincide with The JP layering in as well?

Neill P. Reynolds: Yes. So first of all, thanks for the question. And I think as we've laid out before, there's -- from a utilization perspective, there is a couple of quarter lag between the time you start a wafer to the time we start to see revenues kind of get processed through the fab and then through the back-end operations as well and then eventually out to customers. So the time frame you laid out is correct.

The other thing that impacts utilization and translation into revenue is the mix between automotive parts and in industrial and energy parts. The revenue per wafer, so to speak, is just much higher than industrial and energy part generally than an automotive part.

If you look at the Mohawk Valley revenue just for the June quarter, for instance, we were 85% to 90% EV. If you transition that into the September quarter here, we'll be 95% plus EV and we expect it to remain that way as we push more and more of our qualified parts to Mohawk Valley.

On the flip side, we'll just see the Durham Fab consistently see the EV percentage of revenue start to come down over time. So as that translates into revenue, I think we talked about it. With heavier auto, 20% translates closer

29

to $80 million and close to $100 million is the kind of the normal mix. So I think that's the way to think about it moving forward.

Now as we think about maybe transitioning to Durham fab, we've put a lot more industrial and energy revenue into Mohawk Valley, which as I said before, will be a good trade for us. And then we get back to the kind of, I think, normal economics of thinking about a $2 billion fab and the percentages of supply that are capable at various levels of utilization.

\*\*\*

**Morgan Stanley Executive Director:** I think you gave an EV number in terms of the percentage growth, but I didn't hear an absolute number. I wonder if you could help us kind of size where you are now with EV and what you're classifying as EV.

**Neill P. Reynolds:** Yes. So on the EV revenue, as you said, EV revenue was up 2x in the quarter, 3x year-over-year in the outlook for the September quarter. It's also gone, by the way, from representing about 25% of our power device revenue a year ago to over 50%, even the mid-50% of our power device revenue here in June. And if you look here in the September quarter, more than 60% of our power device outlook. So we expect that to grow even further as the year goes on.

So while we've seen some moderation, I would say, the overall EV growth rates, this has been well documented and reported and supply and demand are more matched up, we do continue to see some significant growth into the December quarter and into the first half of calendar year 2025.

42.     On September 4, 2024, Wolfspeed presented at Citi's 2024 Global TMT Conference.   During the question-and-answer presentation, Defendants Lowe and Reynolds again addressed Mohawk Valley's purported success and continued ramp while speaking to Wolfspeed's poor stock performance throughout calendar 2024, stating as follows:

**Citigroup Analyst:** Gregg, if I can start with the kind of the big question investors have, why do you think your stock price has underperformed by so much this year? What are the investors missing?

30

**Gregg A. Lowe:** Well, a couple of things I would say. Obviously, one of the things we've been working on over the last 6 quarters is getting the operations in better shape. That's been a very, very key focus of me. I've been in Mohawk Valley. I've been in our materials factories pretty consistently during this time. And I think one thing that I think is -- not one thing, but several things have happened.

Number one, Mohawk Valley has now turned into a very good asset for us in terms of production quality, yield, et cetera. Feeding Mohawk Valley out of Building 10 has also substantially increased. We announced that we hit 20% utilization in Mohawk Valley and that's because Building 10 was able to deliver the material to them. And we also announced on our last earnings call that Building 10 will actually be able to support a 30% utilization in Mohawk Valley, which is a 50% increase off the same number of growers. So which -- maybe it's not that obvious, but that means our yield out of those growers is 50% better than anticipated. The yields in Mohawk Valley are now ahead of where we intended -- not intended, where we expected them to be at this point, and we still have quite a ways to go to get to what we call entitlement yield.

And then finally, I think something that should not be lost on investors is that our cost out of Mohawk Valley is substantially better than our cost out of Durham. All of this confidence that we have now in our 200-millimeter entire supply chain, Building 10, Mohawk Valley, et cetera, has given us the confidence to announce that we would be shutting down our 150-millimeter line in the Durham facility. We don't have more details right now to give on that. We will give you a detailed plan on that at our next earnings call. But that process is underway, I think.

So I think there's -- for the last 2 years, there's been a question of, can we get 200- millimeter going? And I think that answer has been -- that question has been answered pretty substantially….

**Citigroup Analyst:** Great. And let's just unpack a little bit. You guys mentioned Mohawk Valley, Durham, CapEx. Let's start with the Mohawk Valley fab. Gregg, you're expecting Mohawk Valley fab to reach 25% utilization in September quarter, which is one quarter ahead of the original plan.

What gives you the confidence that you kind of remain on this trajectory of getting to higher utilizations. If you guys just take us to the ground and talk

31

about what changes and improvements have you made where the yields are tracking better and everything?

**Gregg A. Lowe:** There are lots of different angles on this. So -- and I don't have the exact numbers, but the number of tools that have a second tool in the factory is substantially higher than we were certainly a year ago. And I believe we're on track to be fully second of a kind tool by the end of this calendar year. I don't remember where we're at right now, it's pretty high. So that used to be pretty substantially low, like 25%. So anytime one of the tools that only had one-of-a-kind tools went down, it just stopped production.

So we now have multiple tools across the fab, which is good. I think our ability to understand how the tools are going to respond to 200-millimeter silicon carbide has gone substantially up, and that means our maintenance and R&M processes and things like that have gotten a lot better.

Just recall, this is the first 200-millimeter silicon carbide factory. So every single one of those pieces of equipment in this factory saw silicon carbide for the first time, and we had to kind of fine-tune that. And I think that's gone very, very well. If you look at the yields across the products that are going through Mohawk Valley, we've got a very strong kind of up into the right trajectory. And as I said, we're currently ahead of our planned yield on the device in Mohawk Valley.

And then the second thing and it's really important is the output out of Building 10. The JP is coming along very well. It's on time, it's on track. But any time you bring on a new facility, there could be some kind of problem. Basically, that hasn't happened. But Building 10 being able to do 30% versus 20% is a huge relief in terms of time that we need to get the JP on board. The JP has initiated first crystal growth. I personally did it on the first machine. The parts are coming out, looking great. They're matching the quality that we're seeing out of Building 10. We fully expected that because the facilities are not too far away from each other, about 45 minutes, plus or minus a little bit.

And so the team that started up Building 10 is the exact same team that started up the JP. And recall that Building 10 was a squash board, a basketball court, office space, and we turned that into a crystal growth factory. We certainly expect a grounds-up purpose-built facility at the JP to be a lot easier to bring up because we're not dealing with what used to be a squash court that's now trying to be a factory. So we feel real good about it. So quite confident in that. And again, the confidence should be heard loud and clear because we

32

are cutting the cord to 150. And we're very, very confident in the 200-millimeter.

***

**Unknown Analyst:** The first question, I guess, on utilization, you guys are talking about 25% next quarter. And then from your earnings call, you talked about 40% sometime mid next year. The trajectory seems a little slow compared to what we've seen on some other silicon fabs, and I understand silicon carbide. Are you essentially limited by Siler City ramping up or you're doing a slow ramp for some other reason?

**Gregg A. Lowe:** Well, a couple of things. So first off, we made the announcement that Building 10 can support 30% utilization. And at the same time, we said we're starting to grow crystals in Siler City and that project is on time. So I think those 2 things are actually very positive for our ability to ramp the fab. We've mentioned that our fab yields are ahead of what our plan is, but we still have ways to go from an entitlement perspective.

So having a more modest ramp is going to be helpful in terms of we'll get more out of the chips as our yields continue to improve. And so I think the -- I think we've got a good ramp plan. And I think that plan has been successful over the last 6 quarters where we went from essentially no revenue. I think it was $1 million a year ago last quarter to basically $40-plus million. So I think the ramp has been a very good ramp for us, and I think the plan that we have going forward is good as well.

Unknown Analyst: Got it. Just a quick follow-up on that. How should investors think about risk on utilization ramp like, for example, going from 0% to 20% versus 20% to, let's say, 60%…

**Gregg A. Lowe:** Yes. So in terms of the things you need to deal with, 0% to 20% is a lot harder than 20% to 40%. There's no question about it, especially if it's never been done before. And that's what we faced. So all of those machines, as I said, we're seeing silicon carbide for the first time. So we anticipate that it will be a smoother ramp from 20% to 40%. And again, we're in the process of improving yields, improving cycle time. So I think we'll -- I think it will be a good -- I think we've got a good plan.

43.     The above-referenced statements were false and/or materially misleading.

The false impression was created that the Company possessed reliable information

pertaining to its projected revenue outlook and anticipated growth while also minimizing risk from seasonality and macroeconomic fluctuations. In truth, the optimistic claims of the potential and growth of the Mohawk facility and general demand for the 200mm wafers in the electronic vehicle market fell short of reality; the demand for the Company's key product had been overstated and undue reliance was placed on purported design wins while the facility's growth had begun to taper before even recognizing the $100 million revenue per quarter allegedly achievable with only 20% utilization of the fab, let alone the promised $2 billion revenue purportedly achievable by the facility.

**THE TRUTH EMERGES**

44.     On November 6, 2024, after the market closed, the Company released its first quarter results for fiscal year 2025 and conducted a corresponding earnings call to discuss the reported slowdown and reduced guidance. In pertinent part, Defendant Lowe discussed the Company's setbacks and detailed the steps they are taking to reduce costs going forward:

> I'll now address how we're simplifying our business and focusing on our 200- millimeter device platform, lowering our cost structure and capital requirements to accelerate the path to profitability. Wolfspeed is the first silicon carbide company in the industry to transition its entire device business to 200-millimeter. This strategic move is driven by superior yields, improved IPOs and overall enhanced economics that we're seeing in our 200-millimeter platform. This will allow us to utilize our capacity more efficiently due to more automated manufacturing at our 200-millimeter Mohawk Valley fab versus our very manual 150-millimeter Durham fab. This will enable us to eliminate redundancies, significantly improving gross margins.
>
> The transition to a fully 200-millimeter device platform also provides opportunities to streamline our organization and lower our operating expenses. Considering the slower growth of EVs adoption and the continued

weakness in industrial and energy, the steps we are taking will rightsize the business and generate additional cash savings.

These steps include: first, we have begun to execute our plan to close our 150- millimeter device fab on the Durham campus. This closure will be a phased process over the next 9 to 12 months, and we are currently working with customers to finalize the transition time frame.

Second, we are optimizing our capacity footprint by closing our epitaxy facility in Farmers Branch, Texas and indefinitely suspending our construction plans for the next device fab in Saarland, Germany. We expect to ramp down final production in Farmers Branch by the end of this calendar year.

Regarding Saarland, we have spoken with government officials and Zeta and they understand that we would need to see a clear acceleration of our customer demand and additional capacity requirements before we would reconsider construction at the site. While we are indefinitely suspending our activities in Saarland at this time, should we determine to build a fab in the future, the in-store site remains our preferred site in Europe.

Third, we have implemented a workforce reduction in our administrative and other business functions. This reduction, along with the factory closures, will impact approximately 20% of our total employee base. This reduction will better align our business with current market conditions and customer demand. These facility and head count restructuring initiatives are targeted to generate annual cash savings of approximately $200 million, significantly improving our projected cash flow from operations over time. These actions will foster a stronger, more agile company, ready to seize the opportunities ahead. Many of these reductions have already occurred, and we expect to complete the majority of the actions by the end of the year.

And lastly, we are further reducing our fiscal 2025 CapEx guidance range by an additional $100 million to a new range of $1.1 billion to $1.3 billion, excluding federal incentives. This reduction will align the pace of our CapEx spend with the broader shift in EV and I&E market demand that we are currently observing.

*** 

As we stated in the past, we are in the very early stage of the most significant and disruptive transition in the auto industry. While this creates a potential

35

for significant growth and opportunity in the long term, it will also result in a dynamic environment in the near term. As with any disruptive technology, we are seeing EV customers revise their launch time lines as the market works through this transition period. This push out in anticipated EV demand does not reflect diminished confidence in the long-term demand for the adoption of EVs.

***

Although demand is expected to ramp more slowly than we originally anticipated, we are continuing to win our share in the EVs marketplace.

***

For the industrial and energy sectors, we are seeing continued softness, primarily due to broader macroeconomic pressures, including higher interest rates and the rising cost of capital, which have delayed investment cycles and contributed to a slower recovery for this sector. These conditions also resulted in shorter lead times and limited visibility throughout the broader supply chain. While the industrial and energy end markets have remained challenged with orders remaining weak, we are seeing an increase in end customer demand as inventory levels in the market are starting to decline. As such, we expect the market will begin to recover in the first half of calendar 2025, and as we see broader market conditions further stabilize and move forward to a recovery, we'll be prepared to support the increased demand.

Now let's take a minute to cover the great progress we've made in building out our 200-millimeter footprint. For the first time, the revenue from our 200-millimeter fab at Mohawk Valley exceeded the revenue from our legacy Durham fab in Q1. While this revenue was lower than originally anticipated due to market demand and customer pushouts, we continue to see great performance out of the fab with yield and cycle times ahead of plan, and anticipate future improvements as we ramp the fab.

45.    Defendant Reynolds further elaborated on the financial details of alleged

decline in demand and the plan to cut costs to match such reduced demand, stating, in

pertinent part, the following:

Given the higher yields and efficiency of our 200-millimeter production in both substrate and fast stages, in conjunction with a weaker short-term

36

market outlook, we will lower our capital expenditures in fiscal year 2025 to $1.1 billion to $1.3 billion. This is a reduction of $100 million versus our prior guidance. This will allow us to largely complete our facility build-out at the JP and Mohawk Valley while being more prudent with tool expenditures in order to match supply output with market demand. However, with the facilities largely complete, we will be poised to respond with tool installations to expand capacity and serve our customers when demand reaccelerates.

Now that we have made the decision to move our power device business fully to 200-millimeter, this will allow us to restructure our company to significantly simplify our operating model, lower our non-GAAP EBITDA breakeven point and exit assets we will no longer require for production. As Gregg discussed, we have a variety of operational and headcount restructuring initiatives that are already underway to reduce our overall cost basis and streamline operations. These actions upon completion are targeted to generate annual cash savings of approximately $200 million. This restructuring will be cash neutral in fiscal year 2025 and start generating a large portion of the $200 million of annual cash savings during fiscal year 2026.

As part of this program, we expect to recognize total restructuring charges of approximately $400 million to $450 million over the next several quarters, including $87 million in charges recorded in Q1.

***

To expand a bit on the restructuring initiatives that Gregg mentioned. First, as a result of our successful transition to 200-millimeter, we are in the process of closing our Durham 150-millimeter device fab. This decision underscores our confidence in 200-millimeter technology and a superior yield, better die costs and overall improved economics. It will be a phased closure, which we expect to complete by the second half of calendar 2025. We expect revenue contribution from the Durham fab to continue for the next 4 quarters with the expectation of a gradual phasing out and transfer of revenue to Mohawk Valley over time.

***

Finally, we are implementing a reduction to our overall nonfactory workforce. And this, along with the factory closures, will impact approximately 20% of our total employee base. The majority of these

workforce reductions will be completed by the end of this calendar year. We expect to see lower operating expenses and immediate savings in the current quarter and beyond.

\*\*\*

Now moving on to our quarterly results. We generated $195 million of revenue for the quarter, slightly below the midpoint of our guidance and down 3% sequentially. We recognized power revenue of $97 million, down quarter-over-quarter, driven largely by lower demand in the industrial and energy sectors. Revenue contribution from Mohawk Valley was $49 million, up more than 20% quarter-over-quarter but at the lower end of our range due to lower customer demand within the quarter. We also note that this is the first quarter that Mohawk Valley contributed more power device revenue than the Durham fab and with higher yields and consistent operating execution remains poised to deliver higher levels of revenue in future periods.

\*\*\*

Finally, turning to our Q2 2025 guidance. We target Q2 2025 revenue to be between $160 million to $200 million, reflecting the current macro environment and our demand visibility related to EVs. We continue to have ongoing customer demand discussions that we expect to provide more clarity for calendar 2025 as we complete the quarter. The rights revenue at Mohawk Valley is targeted to be between $50 million to $70 million for Q2.

46.    A question-and-answer segment followed the prepared remarks, during which Defendants Lowe and Reynolds discussed the potential lost revenue caused by shuttering the Durham facility and their ability to meet CHIPS act milestones insofar as they relate to the Mohawk Valley facilities' growth ramp. In pertinent part, Defendants Lowe and Reynolds responded to the following inquiries, touting their "solid" plan:

**JPMorgan Chase & Co Analyst:** This is Joe Cardoso on for Samik. I was wondering if you could provide a bit more color on how you guys are envisioning the magnitude and timing relative to the revenue ramp down of the Durham device fab and the impact to your top line through the next year. And as you talk to customers around transitioning the capacity that you're

38

currently running out of Durham to Mohawk, what's your sense on the appetite to transition this capacity versus perhaps customers potentially being more reluctant to do so? Basically, just curious if there's any concerns around not being able to capture all of that as you try to transition it from Durham to Mohawk.

**Gregg A. Lowe:** Yes, thanks. So I'll kick it off and then maybe Neill can give a little bit more color. Obviously, anytime you transition from one fab to another, the customers have an input into that, we're engaged with them. I think the thing that's very different in this particular, situation is that we're moving from a very manual optimized fab to a new, highly automated fab that we believe is going to produce as well, is producing better results and -- out of the tab in North Carolina and also have a higher quality since there will be less manual interventions in that fab.

We're already engaged with customers on that. We've got a pretty solid plan. I think we're transitioning the vast majority of the revenue up to the factory. There will be some parts that don't transfer, but the vast enough amount of revenue is planning to transfer to Mohawk Valley. I would note that all of our powertrain customers that we're shipping to, to today currently have already been qualified and the best that is shipping already out of Mohawk Valley. So that transition was well underway.

**Neill P. Reynolds:** Yes. And just from a revenue perspective coming out of Durham, right now, we are starting to ramp down our automotive products at Durham. That's already well underway. I think from an industrial energy perspective, as Gregg mentioned, we qualified in both auto and nonauto parts, a very significant amount already at Mohawk Valley. So we'll just transition those parts up there.

So as we move into the second half of the year, the fiscal year, we really just think about it from a market perspective, we'll lower revenue, particularly in the Durham fab in this quarter. We'll burn off some inventory. We'll see how that rebound in the second half of the year just driving more towards Mohawk Valley. So we'll see Mohawk Valley revenue continue to increase and Durham kind of come down over the following quarters. At least that's kind of our forecast for today.

What we can tell is some customers may make some end-of-life or later purchases in the fab. We don't have that baked in yet, but we'll wait to see how those kind of play out. Our expectation is we're going to see a lot more

revenue at Mohawk Valley coming forward as Durham starts to come down during the next 9 to 12 months.

***

**Canaccord Genuity Corp Analyst:** On the recent call, you did around the CHIPS Act, you had mentioned some operational milestones that you had to meet in order to qualify for subsequent tranches. Can you just give us a little bit of color on what those milestones are and your confidence in achieving them given the situation that your fundamentals occur?

**Gregg A. Lowe:** Yes. The near term -- the first tranche, and Neill will go through a little bit of detail in terms of what that first tranche means. We've got pretty good -- I would say we've got very solid line of sight to hitting the milestones that are going in for the first milestone that we need to hit.

**Neill P. Reynolds:** Yes. So I think from an operational perspective, we're in good shape. And as it relates to that first tranche, in addition to the -- as I mentioned earlier on equity convertibles, essentially, what you're talking about is 20% to 25% of that first tranche coming in that would also include the next tranche of the debt financing for another $250 million. So I think between the capital raise and the refinancing, the direct disbursements related to the debt financing will drive a significant amount of capital in [indiscernible]. So I think on all fronts, I think we've got a very solid plan here.

47. The aforementioned press releases and statements are in direct contrast to statements they made during the August 16, 2023, January 31, 2024, March 4, 2024, May 1, 2024, August 21, 2024, and September 4, 2024 earnings calls and investor presentations. On those calls, the Company's executives repeatedly touted their significant demand backlog in the electronic vehicle industry, their design ins and design wins, and, significantly, their ability to execute on such demand to ramp the Mohawk Valley facility to both reach $100 million in quarterly revenue by the end of the 2024 calendar year and its eventual purported $2 billion revenue capacity, while simultaneously claiming an ability

40

to maintain cost discipline to sustain their other facilities and plans for future development, and continually minimizing risks associated with seasonality and the potential impact of the macro environment on the Company's future profitability.

48.    Investors and analysts reacted immediately to Wolfspeed's revelation. The price of Wolfspeed's common stock declined dramatically.  From a closing market price of $13.71 per share on November 6, 2024, Wolfspeed's stock price fell to $8.33 per share on November 7, 2024, a decline of about 39.24% in the span of just a single day.

49.    A number of well-known analysts who had been following Wolfspeed lowered their price targets in response to Wolfspeed's disclosures.  For example, William Blair, while reiterating their market perform rating post drop noted that "the outlook once again is well below expectations …  The lack of operational progress is likely to weigh on the shares, creating a natural overhang in a name where management has lost credibility." The analyst went on to note that "Mohawk Valley has stalled in the rate of growth; by our estimate Wolfspeed is now over 30 months behind schedule.  It is worth noting that Missy Stigall is no longer senior vice president of fab operations … Hopefully, this should reaccelerate the ramp of the fab. However, if the headwinds are demand related, how valuable are the design-in and design-wins?"

50.    Similarly, J.P. Morgan, while considerably reducing their price target 15%, highlighted that Wolfspeed "management's disclosures of a worsening demand backdrop relative to EV and I&E Power Devices as well as Materials is now likely to diminish the confidence around stabilization that was starting to build with investors" that WBA is "in

a bit of a downward spiral as there doesn't seem to be any type of strategy around growth with all of management's efforts focused on maintaining its retail earnings base and managing cash obligations."

51.     The fact that these analysts, and others, discussed Wolfspeed's shortfall and below-expectation projections suggests the public placed significant weight on Wolfspeed's prior revenue and sales estimates. The frequent, in-depth discussion of Wolfspeed's guidance confirms that the above-referenced statements were material.

## SUBSEQUENT EVENTS

52.     In November 2024, shortly after the foregoing disclosures, the Company's Board "determined and agreed with Gregg Lowe that he will depart this month from his roles as Wolfspeed's President and Chief Executive Officer and as a member of the Board."

53.     Similarly, in April 2025, just five short months after joining the Wolfspeed Board (joining just one month before the foregoing disclosures), directors Thomas J. Seifert and George H. "Woody" Young III announced their resignations from the Board. Although no reasons were given for the resignations, Plaintiff believes that, given the timing of the resignations and both Seifert's and Young's short time on the Board, the resignations are connected to the wrongdoing alleged herein.

54.     In any event, the Company has now been subjected to the costs associated with filling the gaps created by the departure of Defendant Lowe and two directors.

## INSIDER TRADING

55.     During the wrongful course of conduct as described herein, Defendant Reynolds sold various amounts of the Company's common stock while in possession of material, non-public information regarding the Company's business, operations, and prospects, as follows:

| Insider | Date | Units | Share Price | Profit |
|---------|------|-------|-------------|--------|
| Reynolds | 12/12/2023 | 3,500 | 40.14 | 140,489 |
| | 12/19/2023 | 3,500 | 44 | 153,993 |
| | 12/26/2023 | 3,000 | 44.94 | 134,812 |

56.     As the Company's share price was actually worth $8.33 per share, the price after the truth was revealed, Defendant Reynolds received a substantial material personal benefit from his insider trading by selling his personally held stock at inflated prices up to over five times the stock's actual value.

57.     Although Defendant Reynolds made these sales pursuant to a 10b5-1 trading plan, they are highly suspicious (as is the timing of the adoption of the trading plan) because: (i) the trading plan was adopted on August 30, 2023, days after the initial false statements were made; and (ii) Defendant Reynolds had not sold any Wolfspeed stock prior to these trades nor had he adopted a trading plan prior to this August 30, 2023 trading plan.

## DAMAGE TO THE COMPANY

### Securities Class Actions

58.     On November 15, 2024, a securities class action complaint was filed in the United States District Court for the Northern District of New York against the Officer

Defendants. The complaint alleges violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5, in the case captioned: *Zagami v. Wolfspeed, Inc., et al.*, Case No. 6:24-cv-1395 (BKS/MJK) (N.D.N.Y.) (the "Securities Class Action").

59.     As a result of the wrongs complained of herein, the Individual Defendants have subjected the Company to the significant cost of defending itself and certain of the Company's officers.  The Company will continue to incur significant sums in relation to the Securities Class Actions and any liability or settlement that results.

**Unjust Compensation**

60.     At all relevant times, the Company paid lucrative compensation to each of the Individual Defendants. The Company paid the Individual Defendants in connection with their respective roles as officers and/or directors of the Company.

61.     Accordingly, as part of their respective roles, the Individual Defendants were required to, among other things, exercise due care and diligence in the management and administration of the affairs of the Company, act ethically and in compliance with all laws and regulations, maintain adequate internal controls, and conduct business in a fair and transparent manner.  Further, each of the Individual Defendants had additional duties and responsibilities owed to the Company by virtue of their executive, directorial and/or committee roles, as described *infra*, for which they were compensated for.

62.     However, the Individual Defendants failed to carry out their duties adequately or at all, causing harm to the Company, as alleged herein.  Because the

44

Individual Defendants failed to carry out their respective duties, the compensation they received was excessive and undeserved. As such, the Individual Defendants were unjustly enriched to the detriment of the Company.

**Insider Trading**

63. As also detailed above, Defendant Reynolds, while in possession of material, non-public information (described *supra*), sold copious amounts of his personally held stock at artificially inflated prices for his own personal profit.

**Executive Departure**

64. Following the disclosures described above in November 2024, the Company's Board "determined and agreed with Gregg Lowe that he will depart this month from his roles as Wolfspeed's President and Chief Executive Officer and as a member of the Board."[1]

65. Defendant Lowe held a high-ranking executive role within Wolfspeed and filling that role will require the Company to expend significant amounts. As is commonly reported, the cost of replacing C-suite executives can be costly for a company.[2] Thus, the

---

[1] *Wolfspeed Announces Leadership Transition*, Wolfspeed (Nov. 18, 2024), https://investor.wolfspeed.com/news/news-details/2024/Wolfspeed-Announces-Leadership-Transition/default.aspx (last accessed Apr. 7, 2025).

[2] *See e.g.*, *The Quiet (and Expensive) Cost of Poor C-Suite Retention*, Stanton Chase (Aug. 2022), https://www.stantonchase.com/insights/white-papers/the-quiet-and-expensive-cost-of-poor-c-suite-retention-2 (last accessed Apr. 7, 2025); *CEO Selection: The Costs of Getting it Wrong*, Spencer Stuart (May 2016), https://www.spencerstuart.com/research-and-insight/ceo-selection---the-costs-of-getting-it-wrong (last accessed Apr. 7, 2025); *How Much Does Replacing an Employee Cost?*, BOS (2019), https://www.bos.com/inspired/how-much-does-replacing-an-employee-cost/ (last accessed Apr. 7, 2025).

Company having to replace Defendant Lowe as a result of the Individual Defendants'
wrongful conduct will undoubtedly cost the Company substantial amounts.

**Additional Damage to the Company**

66.     In addition to the damages specified above, the Company will also suffer
further losses in relation to any internal investigations and amounts paid to lawyers,
accountants, and investigators in connection thereto.

67.     The Company will also suffer losses in relation to the Individual Defendants'
failure to maintain adequate internal controls, including the expense involved with
implementing and maintaining improved internal controls.

68.     The Company has also suffered, and will continue to suffer, a loss of
reputation as a direct and proximate result of the Individual Defendants' misconduct which
will plague the Company's share price going forward.

## CORPORATE GOVERNANCE

69.     At all relevant times, the Company had in place extensive corporate
governance documents imposing duties and responsibilities on its directors and officers,
and additional duties on the Company's committee members. Accordingly, each of the
Individual Defendants were required to comply with the corporate governance documents,
as detailed below.

70.     Despite the following corporate governance, the conduct of the Individual
Defendants complained of herein involves a knowing and culpable violation of their
obligations as directors and officers of the Company, the absence of good faith on their

46

part, and a reckless disregard for their duties to the Company and its investors that the Individual Defendants were aware posed a risk of serious injury to the Company.

**Code of Conduct[3]**

71.    At all relevant times, the Company had in place its Code of Conduct which "applies to every employee around the world, and to our Board of Directors." From the outset, the Code of Conduct emphasizes that "Wolfspeed is committed to maintaining high standards of employee conduct and business through our Wolfspeed values, policies, and laws. While some employee conduct is not governed by any law, regulation, policy, or procedure, employees are expected to follow generally accepted practices of business and exhibit professional conduct while performing their jobs and when representing the Company. This applies to job performance, attendance, interpersonal relationships, and overall honesty and integrity."

72.    In a section entitled "Responsibilities to our shareholders," the Code of Conduct states:

### ACTING WITH RESPONSIBILITY

and transparency goes hand-in-hand with protecting shareholder value. We all create value for our shareholders by putting our Wolfspeed's interests first, maintaining accurate business records, and protecting and properly using company resources, information and property.

---

[3]    The Company's Code of Conduct is currently unavailable as it is undergoing "reconstruction." Plaintiff has obtained a previous version of the Code of Conduct effective during June 2022. *See* Wolfspeed Code of Conduct (2021), https://web.archive.org/web/20220621215636/https://s29.q4cdn.com/278875087/files/doc_downloads/governance/wolfspeed_code_of_conduct.pdf (last accessed Apr. 7, 2025). Upon information and belief, this prior version of the Code of Conduct is the same as, or similar to, the version in force during the wrongful course of conduct alleged herein.

***

**ACCURATE BUSINESS RECORDS**

*Wolfspeed's commitment to accuracy in our Company's books and records underscores our guiding principle of transparency in all of our business actions.*

Business records, including our financial statements, contracts, and agreements, must always be accurate and reflect a true presentation of the facts. No matter what type of document or how insignificant it might seem, the information contained in a business record must always be truthful and complete. Financial records must reflect all components of the financial transactions and events. Likewise, individual employee transactions, no matter what the dollar amount, must be properly authorized, executed, and recorded.

You are accountable for the accuracy of the business records that you handle in the normal course of business. You should never:

• Falsify, omit, misstate, alter or conceal any information or otherwise misrepresent the facts on a Company record

• Encourage or allow anyone else to compromise the accuracy and integrity of our records

If you notice an inaccuracy in a Company record, or a failure to follow our internal control processes, you must promptly Say Something and report it.

Our investors and the general public rely on Wolfspeed to accurately report on the state of our business, including our earnings and our financial condition. The disclosures we make in our public communications, regulatory disclosures, and reports submitted to the U.S. Securities and Exchange Commission and to other governmental agencies must always be full, fair, accurate, timely, and understandable. If you are involved in any aspect of preparing our financial statements, or the certifications on which they rely, you must always follow our financial policies and our system of internal controls.

73. In a section entitled "Insider Trading and Transactions in Wolfspeed

48

Securities," the Code of Conduct states the following:

> You may violate the law if you trade stock based on "inside information."
>
> In the course of performing your job, you may learn of certain confidential information that qualifies as "material non-public information" about Wolfspeed, one of its customers, suppliers or business partners or another third party. Information is considered to be "material non-public information" when it:
>
> • has not been widely disseminated to the public, and
>
> • is information that a reasonable investor would consider important when making a decision to buy or sell a particular stock or security You should not disclose material non-public information to anyone outside Wolfspeed, including family members and friends.
>
> You should not transact in Wolfspeed securities or the securities of another company involved with Wolfspeed while you have material non-public information about Wolfspeed or that company. This prohibition on trading applies to all transactions in Wolfspeed securities, including purchasing or selling Wolfspeed securities, exercising options and selling restricted stock units.

74.    In a section entitled "External Communications and Social Media," the Code

of Conduct states:

> *As a general matter, employees are not authorized to speak on behalf of our Company.*
>
> Wolfspeed's Chief Executive Officer ("CEO"), Chief Financial Officer ("CFO"), and VP of Investor Relations are designated as authorized Company spokespeople to disclose information about the Company to the investment community and the media. Any such disclosures shall be made in accordance with all applicable Company policies and procedures, and all applicable laws and regulations. Other Company employees may from time to time be designated by the CEO, the CFO, or the VP of Investor Relations to act as Company spokespeople in specific circumstances and for limited times. Company employees shall not act in this capacity without express authorization from any of the Company's CEO, CFO, and VP of Investor Relations indicating the specific purpose.

49

Media inquiries regarding financial matters, including earnings announcements, will be handled primarily by the CFO or the VP of Investor Relations. Other media inquiries will be handled primarily by the Company's external Public Relations ("PR") firm.

If you are contacted and asked to discuss Company business with any member(s) of the press, investors or market analysts, do not provide any information. Instead, you should politely advise the outside party that you are not authorized to discuss the subject, and refer them to the spokespeople designated above.

Similarly, when using personal social media, you must be clear that you do not speak on behalf of the Company. You should always:

• Take every possible precaution to ensure that you are not disclosing any confidential information about Wolfspeed or its business partners

• Refrain from using any Wolfspeed or third-party logos or trademarks without written permission

**Code of Ethics for Executive Officers**

75.     In addition to the Code of Conduct, the Company's "executive officers and other senior financial personnel are also subject to the additional policies stated in [the] Code of Ethics."

76.     In a section entitled "Honest and Ethical Conduct," the Code of Ethics states:

The Company expects all directors and employees, including the senior financial personnel, to act with integrity and in accordance with sound business ethics in performing their duties and to avoid actual and apparent conflicts of interest between personal and professional relationships. The senior financial personnel are also expected to serve as leaders in fostering a culture of honesty and ethical conduct throughout the organization.

Senior financial personnel who become aware of a violation or suspected violation of the Company's Code of Conduct, including any actual or apparent conflict of interest between personal and professional relationships, involving any management or other employee who has a significant role in

50

the Company's financial reporting, disclosure or internal controls, shall promptly report the violation to the General Counsel and to the Audit Committee.

77.     In a section entitled "Full and Fair Disclosure," the Code of Ethics states:

The senior financial personnel are responsible for full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, the Securities and Exchange Commission and in other public communications of the Company. Accordingly, the senior financial personnel must be familiar with the general disclosure requirements applicable to the Company and are responsible for establishing and maintaining effective disclosure controls and procedures and internal controls for financial reporting and other Company communications.

Senior financial personnel are prohibited from knowingly: (a) making or permitting or directing another to make materially false or misleading entries in the financial statements or records of the Company or any of its subsidiaries; (b) failing to correct materially false or misleading financial statements or records of the Company or any of its subsidiaries; (c) signing or permitting another to sign a document containing materially false or misleading information; or (d) responding falsely and materially, or materially failing to respond, to specific inquiries of the Company's independent auditors.

Senior financial personnel who become aware of (a) any significant deficiencies in the design or operation of internal controls which could adversely affect the Company's ability to record, process, summarize and report financial data, or (b) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's financial reporting, disclosures or internal controls, shall promptly report the deficiencies or fraud to the Audit Committee and the General Counsel.

78.     In a section entitled "Compliance with Law," the Code of Ethics states:

The Company expects all directors and employees, including the senior financial personnel, to comply with applicable governmental laws, rules and regulations in conducting the business of the Company and its subsidiaries.

Senior financial personnel who become aware of evidence of a material violation, by the Company or its subsidiaries or any agent thereof, of any

51

securities laws or other governmental laws, rules or regulations shall promptly report to the General Counsel and Chairman of the Audit Committee all information he or she has concerning the violation.

**Audit Committee Charter**

79.    At all relevant times, the Company had in effect its Audit Committee Charter which sets forth the additional duties and responsibilities of the Audit Committee. The Audit Committee Charter begins by stating that the purpose of the Audit Committee is to:

• to assist the Board of Directors in providing oversight with respect to (i) the quality and integrity of the Company's financial statements and system of internal controls and its accounting and financial reporting processes; (ii) all audit, review and attest services relating to the Company's financial statements and internal control over financial reporting (collectively, "audit services"), including the appointment, compensation, retention and oversight of the work of the independent auditors engaged to provide audit services to the Company; (iii) the independent auditor's qualification and independence; (iv) the Company's compliance with legal and regulatory requirements; and (v) the performance of the Company's internal audit function and independent auditors.

• to report to the Board of Directors on such matters as the Committee deems necessary or appropriate to assure that the Board is informed of any significant developments within the scope of the Committee's responsibilities that merit the attention of the Board;

• to provide the report required of the Committee by the rules of the Securities and Exchange Commission (the "SEC") for inclusion in the Company's annual proxy statement; and

• to fulfill such other responsibilities as may be required of the Committee under applicable law.

80.    The Audit Committee Charter then sets forth the "Responsibilities and Authority" of the Audit Committee, in pertinent part:

*Generally*

The Committee shall have such responsibilities and authority as are expressly set forth in this Charter or are necessary or incidental to carrying out the purpose of the Committee as stated above, together with such other responsibilities and authority as may be prescribed from time to time by the Board of Directors, by the applicable NYSE rules or other listing standards applicable to the Company, or by rules or regulations of the SEC or the Public Company Accounting Oversight Board ("PCAOB") or other law.

***

*Related Person Transactions*

In accordance with applicable NYSE rules, the Committee shall conduct appropriate review and oversight of all related person transactions for potential conflict of interest situations on an ongoing basis; provided, however, the Board of Directors may from time to time delegate to another independent body of the Board of Directors the authority to conduct appropriate review and oversight of related person transactions for potential conflict of interest situations. The Company shall not be authorized to engage in any related person transaction unless the Committee or another independent body of the Board of Directors delegated by the Board of Directors approves the transaction. For purposes of this paragraph the term "related person transaction" refers to transactions required to be disclosed pursuant to SEC Regulation S-K, Item 404, and to any other transaction for which approval by an independent body of the Board of Directors is required pursuant to applicable law or listing standards applicable to the Company.

***

*Code of Conduct*

The Committee shall have oversight responsibility with respect to the Company's Code of Conduct. The Committee shall periodically review with management the scope and administration of the Company's Code of Conduct to assure that it is kept updated and is appropriate for the Company's business and activities; that it applies to all Company directors, officers and employees; and that it is made publicly available in accordance with applicable SEC and NYSE rules and regulations.

Any amendments or waivers of the Code of Conduct effected for or granted to any director or executive officer must be approved by the Board of Directors, or by the Committee acting on behalf of the Board and shall be

53

promptly reported publicly in accordance with applicable SEC regulations.

The Committee's oversight responsibility for the Code of Conduct shall include oversight of the administration of the Company's Securities Trading Policy. The Committee shall periodically review the securities trading policy and recommend any proposed changes to the Board of Directors for approval.

*Other Responsibilities and Authority*

In carrying out its duties the Committee shall also:

• On a quarterly basis, discuss with management the Company's earnings release and revenue and earnings guidance, if any, prior to the public dissemination of such releases and guidance, and any financial information and earnings guidance provided to analysts and rating agencies, including the type of information to be disclosed and type of presentation to be made.

• Following the conclusion of each audit and quarterly review of the financial statements, meet with the independent auditors and financial management of the Company to discuss the results of the audit or review, including any comments or recommendations by the independent auditors.

• Report the results of the annual audit to the Board of Directors. If requested by the Board of Directors, the Committee shall invite representatives of the independent auditors to meet with the Board to assist in reporting the results of the audit and to answer directors' questions regarding the audit.

• Prior to the filing of the Company's annual report on Form 10-K, review the financial statements contained in the Form 10-K, and the corresponding disclosures contained in "Management's Discussion and Analysis of Financial Condition and Results of Operations" in the Form 10-K, with management and the independent auditors to determine that the independent auditors are satisfied with the disclosures and content of the financial statements. Review with financial management and the independent auditors the results of their analysis of any significant financial reporting matters and practices, and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements and discuss any other matters communicated to the Committee by the independent auditors. Also review with financial management and the independent auditors their judgments about the quality, not just acceptability, of the Company's accounting principles and the clarity of the financial disclosure practices used. Also

54

assess the degree of aggressiveness or conservatism of the Company's accounting principles and underlying estimates and other significant decisions made in preparing the financial statements. The reviews contemplated by this paragraph should include open and frank discussions.

• Recommend to the Board of Directors whether the audited financial statements should be included in the Company's annual report on Form 10-K and provide an audit committee report to be included in the Company's proxy statement as required by SEC rules.

• Review the Company's quarterly financial statements and corresponding disclosures contained in "Management's Discussion and Analysis of Financial Condition and Results of Operations" in the Company's quarterly report on Form 10-Q with financial management and the independent auditors, including the results of the auditors' review of the quarterly financial statements, prior to the filing of the Form 10-Q report and prior to the release of financial results, if practicable.

\*\*\*

• Oversee management's enterprise risk management (ERM) efforts including, review of guidelines and policies governing the Company's risk assessment and risk management processes, and regularly discuss identified risk exposures and the steps management has taken to identify, mitigate and monitor such exposures. In addition, the Committee will periodically review management's ERM efforts with internal and independent auditors and report to the Board regarding significant matters identified with respect to the foregoing.

\*\*\*

• Review disclosures made to the Committee by the Company's Chief Executive Officer and Chief Financial Officer, in connection with their certifications relating to the Company's periodic reports, about any significant deficiencies in the design or operation of internal control over financial reporting or material weaknesses and any reported fraud involving management or other employees who have a significant role in the Company's internal controls.

\*\*\*

• Review matters related to the corporate compliance activities of the

Company.

• Investigate any matter brought to the Committee's attention within the scope of its duties if the Committee determines that an investigation is necessary or appropriate, and the Committee shall be authorized in that respect to require directors, officers, employees, attorneys, accountants and other advisers to the Company to provide such information and records relating to the subject of the investigation as the Committee may request.

• Review with management, the independent auditors and the internal audit department, as appropriate, any correspondence with regulators or governmental agencies, any complaints received by the Company or the Committee and any employee submissions or published reports, which raise material issues regarding the Company's financial statements or accounting policies.

• Review with the Company's General Counsel or Associate General Counsel legal matters that may have a material impact on the Company's financial statements.

• As soon as reasonably practicable thereafter, report to the Board of Directors concerning the Committee's activities at Committee meetings and with respect to such other matters as are relevant to the Committee's discharge of its responsibilities. The report to the Board of Directors may take the form of an oral report by the Chair or any other member of the Committee designated by the Committee to make such report.

## FIDUCIARY DUTIES OF THE DIRECTOR DEFENDANTS

81.     As members of the Company's Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

82.     The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties

56

to the Company and its investors that the Director Defendants were aware posed a risk of serious injury to the Company.

83.     By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Director Defendants owed the Company and its investors the fiduciary obligations of trust, loyalty, and good faith.  The obligations required the Director Defendants to use their utmost abilities to control and manage the Company in an honest and lawful manner.  The Director Defendants were and are required to act in furtherance of the best interests of the Company and its investors.

84.     Each director of the Company owes to the Company and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.  In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

85.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and investing public;

(b) conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d) remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e) ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

58

(f) ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

86.     Each Director Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

87.     The Director Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the financial condition of the Company.  As a result, the Company has expended, and will continue to expend, significant sums of money related to investigations and lawsuits and to structure settlements to resolve them.

## DERIVATIVE AND DEMAND REFUSED ALLEGATIONS

88.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, gross mismanagement, and other wrongful conduct as alleged herein.

89.     Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

90.     Plaintiff is a current owner of the Company's common stock and has continuously been an owner of the Company's stock during all times relevant to the Director Defendants' wrongful course of conduct alleged herein. Plaintiff understands her obligation to hold stock throughout the duration of this action and is prepared to do so.

91.     On December 31, 2024, because of the misconduct alleged herein, Plaintiff, through her counsel, served a litigation demand on the Board (the "Demand"), as required by N.C. Gen. Stat. § 55-7-42, demanding that "full corrective action be brought, including commencing legal proceedings against each of the current and former officers, executives and members of the Board named above, all of whom have been responsible for harming the Company as a result of the wrongdoing outlined in this letter." *See* **Exhibit A**.

92.     Plaintiff waited for ninety (90) days to receive a response from the Board, as required by N.C. Gen. Stat. § 55-7-42(2).  However, to date, Plaintiff has not received any response or acknowledgement from the Board.

93.     Having received the Demand, the Board were required by North Carolina law to conduct a reasonable inquiry into the issues raised in the Demand. However, the Board, in complete dereliction of their duty to the Company and duties under North Carolina law, have utterly failed to conduct any inquiry or even consider Plaintiff's demand. Such failure is wrongful, unreasonable, and contrary to the best interests of

60

Wolfspeed.

94.     The Board's failure to investigate the wrongdoing or commence a civil action for an undetermined amount of time, if at all, constitutes an improper and wrongful refusal of the Demand and will irreparably prejudice the Company and its claims. The wrongs complained of in the Demand remain uncorrected and the Company will suffer additional damage as a result.

95.     In addition, the Board's refusal could subject the Company's claims to the applicable statute of limitations period, leaving the Company without remedy. As such, the Board's failure cannot be reasonably interpreted as being in the best interests of the Company.

96.     The Company has suffered damage and will continue to suffer damage if the wrongs complained of herein remain uncorrected. Thus, Plaintiff has satisfied the demand requirements under North Carolina law and may pursue this action to procure a judgment in Wolfspeed's favor and should be permitted to proceed with this derivative action.

## CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

### (Against the Individual Defendants for Breach of Fiduciary Duty)

97.     Plaintiff incorporates by reference and re-allege each and every allegation contained above, as though fully set forth herein.

98.     The Individual Defendants owe the Company fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe the

61

Company the highest obligation of good faith, fair dealing, loyalty, and due care.

99.     The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

100.     The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.  Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent that it possessed reliable information pertaining to its projected revenue outlook and anticipated growth while also minimizing risk from seasonality and macroeconomic fluctuations. In truth, the optimistic claims of the potential and growth of the Mohawk facility and general demand for the 200mm wafers in the electronic vehicle market fell short of reality; the demand for the Company's key product had been overstated and undue reliance was placed on purported design wins while the facility's growth had begun to taper before even recognizing the $100 million revenue per quarter allegedly achievable with only 20% utilization of the fab, let alone the promised $2 billion revenue purportedly achievable by the facility.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

101.     As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

102.    As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

### SECOND CAUSE OF ACTION

### (Against the Individual Defendants for Gross Mismanagement)

103.    Plaintiff incorporates by reference and re-allege each allegation contained above, as though fully set forth herein.

104.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

105.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages in excess of hundreds of millions of dollars.

106.    Because of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

**THIRD CAUSE OF ACTION**

**(Against the Individual Defendants for Waste of Corporate Assets)**

107.  Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

108.  The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going.  It resulted in continuous, connected, and ongoing harm to the Company.

109.  As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend the Officer Defendants' unlawful actions in the Securities Class Action.

110.  As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

**FOURTH CAUSE OF ACTION**

**(Against the Individual Defendants for Unjust Enrichment)**

111.  Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

112.  By their wrongful acts, violations of law, and inaccurate and untruthful information and/or omissions of material fact that they made and/or caused to be made, the

64

Individual Defendants were unjustly enriched at the expense of, and the detriment of, the Company.

113. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance of the Company or its stock price or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

114. Plaintiff, as a shareholder and representative of the Company, seeks restitution from the Individual Defendants and seek an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

## **FIFTH CAUSE OF ACTION**

### **(Against the Individual Defendants for Aiding and Abetting)**

115. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

116. The Director Defendants exploited, aided and abetted, and were knowing and culpable participants to the breaches of fiduciary duty by the Officer Defendants. Likewise, the Officer Defendants exploited, aided and abetted, and were knowing and culpable participants to the breaches of fiduciary duty by the Director Defendants.

65

117. Specifically, the Director Defendants, in violation of the Company's corporate governance, engaged in and/or permitted the Company to engage in the scheme to issue materially false and misleading statements to the public, including in the Company's SEC filings, and by facilitating and disguising the Officer Defendants' violations of law as alleged herein, and failing to report the same.

118. The Officer Defendants, in violation of the Company's corporate governance, engaged in and/or permitted the Officer Defendants' lack of oversight and scheme to issue materially false and misleading statements to the Company's shareholders to secure, *inter alia*, the re-election of certain Director Defendants, by facilitating and disguising the Director Defendants' violations of law as alleged herein, and failing to report the same.

119. As a result, the Director Defendants substantially assisted the Officer Defendants, and the Officer Defendants substantially assisted the Director Defendants in breaching their fiduciary duties and in committing the other wrongful and unlawful conduct as alleged herein.

120. As a direct and proximate result of the aiding and abetting the breaches of fiduciary duty alleged herein, the Company has sustained and will continue to sustain significant damages.

121. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

66

## SIXTH CAUSE OF ACTION

## (Against Defendant Reynolds for Insider Trading)

122.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

123.    By reason of his fiduciary role as an officer of the Company, Defendant Reynolds specifically owed the Company the highest obligation of due care, good faith, and loyalty.

124.    As an officer of the Company, Defendant Reynolds was given access to material information about the Company, as described above, which was not generally available to the public.

125.    When Defendant Reynolds sold his Company stock, as detailed *supra*, he was in possession of material, non-public information described above and sold Company stock on the basis of such information for gross proceeds in excess of $429,200.

126.    The information described above was proprietary, non-public information concerning the Company's business operations and financial condition.  It was a proprietary asset belonging to the Company, which Defendant Reynolds misappropriated to his own benefit when he sold holdings in Company stock.  Defendant Reynolds knew that this information was not intended to be available to the public. Had such information been generally available to the public, it would have significantly reduced the market price of Company stock.

127.    As the use of the Company's proprietary information for their own gain

67

constitutes a breach of Defendant Reynolds' fiduciary duties, the Company is entitled to disgorge any illegal profits obtained thereby.

## SEVENTH CAUSE OF ACTION

### (Against the Director Defendants for Violations of Section 14(a) of the Exchange Act)

128.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

129.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

130.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

131.    The Director Defendants violated § 14(a) of the Exchange Act, 15 U.S.C. §

78n(a)(1), and Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder by the SEC.

132. The 2023 Proxy Statement was used to solicit shareholder votes in connection with the re-election of the Director Defendants to the Board, among other things.

133. The 2023 Proxy Statement was materially false and misleading because the above-referenced statements touted positive statements regarding the Company's financial outlook and risk oversight function, yet failed to disclose material adverse facts concerning the true state of Wolfspeed's growth potential and, in particular, the operational status and profitability of the Mohawk Valley fabrication facility which was known, or should have been known to the Director Defendants in the exercise of prudent business judgment. As such, the foregoing statements in the 2023 Proxy Statement were half-truths, meaning that the Director Defendants were required to (yet failed to) include all additional information necessary to make the statements not misleading. *See* 17 C.F.R. § 240.12b-20.

134. Further, despite assertions to the contrary, the Board did not adequately oversee risk. Thus, the statements in the 2023 Proxy Statement regarding the Director Defendants fulfilling their risk oversight responsibilities were materially false and misleading.

135. In the exercise of reasonable care, the Director Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2023 Proxy Statement were materially false and misleading.

136. The materially false and misleading statements contained in the 2023 Proxy

Statement misleadingly induced shareholders to vote in favor of the election of the Director Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company.

137. The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2023 Proxy Statement.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

A. Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B. Awarding, against all the Individual Defendants and in favor of the Company, the damages sustained by the Company as a result of the Individual Defendants' breaches of their fiduciary duties, gross mismanagement, waste of corporate assets, unjust enrichment, and aiding and abetting;

C. Awarding, against the Director Defendants and in favor of the Company, the damages sustained by the Company as a result of the Director Defendants' violations of Section 14(a) of the Exchange Act;

D. Awarding, against Defendant Reynolds, disgorgement of all illicitly gained proceeds as a result of his unlawful and disloyal insider trading;

E. Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors

70

from a recurrence of the damaging events described herein;

F.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

G.    Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated: April 21, 2025

**BLUE LLP**

By: */s/ Dhamian A. Blue*
Dhamian A. Blue
N.C. Bar No. 31405
205 Fayetteville Street
Raleigh, North Carolina 27601
Telephone: (919) 833-1931
Facsimile: (919) 833-8009
Email: dab@bluellp.com

**GAINEY McKENNA & EGLESTON**
Thomas J. McKenna
Gregory M. Egleston
260 Madison Ave., 22nd Floor
New York, NY 10016
Tel.: (212) 983-1300
Fax: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

*Attorneys for Plaintiff*

**VERIFICATION**

I, SVETLANA LAMON, declare that I have reviewed the Verified Shareholder Derivative Complaint ("Complaint") prepared on behalf of Wolfspeed, Inc. and authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that I am a current holder, and have been a holder, of Wolfspeed, Inc. common stock at all relevant times.

Svetlana LaMon
_____
SVETLANA LAMON

# EXHIBIT A

# GAINEY McKENNA & EGLESTON

**ATTORNEYS AT LAW**

260 MADISON AVENUE
22nd FLOOR
NEW YORK, NEW YORK 10016
TEL: (212) 983-1300
FAX: (212) 983-0383

www.gme-law.com

375 ABBOTT ROAD
PARAMUS, NEW JERSEY 07652
TEL: (201) 225-9001
FAX: (201) 225-900

Please Reply To The New York Address

December 31, 2024

**By U.S. Mail**

Mr. Thomas H. Werner
Executive Chairman
Wolfspeed, Inc.
4600 Silicon Drive
Durham, NC 27703

      Re:    **Shareholder Litigation Demand – Wolfspeed, Inc.**

Dear Mr. Werner,

The law firm of Gainey McKenna & Egleston represents Svetlana Lamon – a current owner of the stock of Wolfspeed, Inc. ("Wolfspeed" or the "Company"). Pursuant to N.C. Gen. Stat. § 55-7-42, Ms. Lamon makes this written demand upon the Company to take suitable action for the wrongs listed below:

Ms. Lamon intends to retain her ownership interest through the conclusion of any further proceedings relating to the contents of this letter. This letter constitutes a formal demand on behalf of our client that Wolfspeed's Board of Directors (the "Board") investigate and commence legal proceedings against the following former and/or current directors, executive officers and agents of the Company: Gregg A. Lowe, Neill P. Reynolds, Darren R. Jackson, Glenda Dorchak, John C. Hodge, Clyde R. Hosein, Duy-Loan T. Le, John B. Replogle, Marvin A. Riley, Stacy J. Smith, and you, for breach of fiduciary duties, gross mismanagement, corporate waste, unjust enrichment, aiding and abetting, violations of Section 14(a) of the Exchange Act, and insider trading. The Board should also consider and implement corporate governance reforms designed to address and prevent the sort of wrongdoing described in this letter.

## BACKGROUND

As you are aware, Wolfspeed is a global semiconductor company focused on silicon carbide materials and the fabrication of devices for power applications. Wolfspeed largely targets its products toward the electric vehicle and industrial and energy sectors through its fabrication facilities in Mohawk Valley, New York and Durham, North Carolina.

## FALSE AND MISLEADING STATEMENTS

On August 16, 2023, an earnings call was held which corresponded to the Company's fourth quarter fiscal year 2023 results. In pertinent part, Mr. Lowe discussed the ramp of the Company's fabrication facility (or "Fab") in Mohawk Valley as follows:

> Our Mohawk Valley Fab, which is the world's largest fully automated 200-millimeter silicon carbide fab began shipping product and contributing revenue. Last October, we outlined our plans to construct the world's largest state-of-the-art greenfield silicon carbide footprint. Since then, we've secured $5 billion of the capital necessary to achieve these goals, allowing us to finish out the fit out of Mohawk Valley, expand our materials capacity at Durham, and break ground on the world's largest 200-millimeter silicon carbide materials facility, the JP and Siler City, North Carolina.

***

> As it relates to Mohawk Valley and our device business, we have continued our ramp-up efforts and recorded approximately $1 million in device revenue out of the fab in fiscal Q4. Silicon carbide is a complex technology that's very difficult to master, and I'm proud of how our team has worked tirelessly to get this ramping device production in a brand-new, highly automated fab. We still have some work to do at Mohawk Valley as we scale device production and expect a modest increase in device revenues in the first half of fiscal 2024 with a steeper increase in revenue beginning in the second half of 2024.

***

> From a device perspective, we are seeing continued strength across our end markets, and we secured approximately $1.6 billion in design-ins for fiscal Q4. For fiscal 2023, design-ins totaled approximately $8.3 billion. And the cumulative total now stands in excess of $19 billion secured in the last 4 years. Our customer wins to date give us the confidence in the growth of our addressable market and our ability to capture meaningful share of the device market between now and the end of the decade. More than anything, we're proud of our role in building greater awareness for silicon carbide. At the same time, the world is realizing the importance of the global semiconductor industry. The secular trends that are driving the adoption of silicon carbide have started to receive widespread public recognition as a truly game-changing technology in the power semiconductor space

During the call, Mr. Reynolds provided more discrete details for the Mohawk Valley facility's trajectory, adding, in pertinent part:

As Gregg mentioned, we recognized $1 million in revenue from Mohawk Valley,

while we are still aligned on previous expectations that we will reach 20% utilization out of Mohawk Valley by the end of fiscal 2024, it is important to note that it will be the second half of the calendar year 2024 before we see $100 million of quarterly revenue from the fab that the 20% utilization would represent. This accounts for the time between fab starts and shipments to our customers.

\*\*\*

As we've said in the past, the main driver of future revenue growth for power devices will be the incremental revenue contribution from Mohawk Valley.

A question-and-answer segment followed the prepared remarks, during which Messrs. Lowe and Reynolds confidently reiterated the purported potential of Mohawk Valley, pertinent in response to the following inquiry:

**Piper Sandler & Co. Analyst:** Greg, I've got 1 for you. It's pretty clear that your future growth of the company lies with Mohawk Valley, so maybe you could talk about what you want to see happen in that fab to ramp that facility, you did $1 million. I think you were pretty clear in the call, you did $1 million last quarter, but you're talking about a $100 million achievement in the second half of 2024. Would that be towards the beginning of second half or towards the end of -- in other words, are we talking March? Or are we talking the June quarter for you to get to $100 million? And then more importantly, what do you need to see at the fab to get to that kind of a number?

**Gregg A. Lowe:** Yes. Thanks a lot, Harsh. A couple of things. So first off, in ramping that fab, we obviously have to ramp the materials flowing into that fab. I'll give you a brief update on that. The 200-millimeter crystal growth operation and Building 10 is well on its way in producing excellent quality material, which is translating into very nice -- excellent defect density wafers. Epi, a 200-millimeter is also excellent, and we are ramping that as we speak. And now we're obviously shipping products from the Mohawk Valley fab.

We have 3 products that are currently fully qualified in 200-millimeter for at Mohawk Valley Fab and we have 8 additional products that now pass all reliability testing and are working through the final end of some qualification for that. So that's all in really great shape. Now as we ramp this up, obviously, the $1 million of revenue in fab is capable of $2 billion is kind of early innings of ramping. As we ramp the fab, we'll be dialing in the processes and dialing in the equipment, which will take our yields up to entitlement yield. And as we ramp the fab, that will absolutely may happen. So what I would say is the fact that we're ramping a new 200-millimeter crystal. The fact that the crystal quality is excellent and the quality of defectivity on the wafer is excellent. Combine that with EPIs and really good

shape from a process standpoint. And we've got a fab that has 3 qualified devices this early and 8 that have passed reliability gives me great confidence that we're going to be -- that it's fab is going to deliver in the entire supply chain that's going to deliver everything that we expected out of this. In terms of the ramp of the production and the expectation for the amount of revenue. Our expectation is that we'll be at 20% utilization by the June quarter. and I'll let Neil translate that into what you can expect out of revenue.

**Neill P. Reynolds:** Yes. And just remember, Harsh, as you think about utilization, that's the time frame from the time you actually load the fab -- wafers into the fab from a utilization perspective until you freeze the wafers, put them to the back end and finally shipping to the customer. So somewhat of a delay you'd expect from the time to achieve utilization level. So as we get the 20% towards the end of the year, you wouldn't expect to see the revenue translation of that, as we get a 20% utilization, say, by the June quarter, we wouldn't expect a revenue translation of EPI, the equivalent of $100 million to be sometime after that sometime in the second half of calendar '24. So first half of calendar fiscal '25 as you think about that time frame. So the sort of timing of the revenue and of the Fab is we did about $1 million or so last quarter. We'll see a bit of a tick up here in Q1, a modest pickup, I think, again, in 2Q and then a steeper ramp as you get to the back half of the fiscal year into the March and June quarter, and then we should be on our way from there.

On September 8, 2023, the Company filed its 2023 Proxy Statement on Schedule 14A with the SEC, solicited by Glenda Dorchas, John Hodge, Clyde Hosein, Darren Jackson, Duy-Loan Le, Gregg Lowe, John Replogle, Marvin Riley, Stacy Smith, and you. The 2023 Proxy Statement solicited shareholder votes in favor of, *inter alia*: (i) re-election of the foregoing directors to the Board; and (ii) approval of the 2023 long-term incentive compensation plan. The 2023 Proxy Statement, the following statements were made:

Fiscal 2023 Business Highlights.

- Year-over-year revenue increased by $175.7 million to $921.9 million.

- Gross margin decreased to 30.3% from 33.4%. Gross profit increased to $279.5 million from $249.3 million.

- Combined cash, cash equivalents and short-term investments increased to $2,954.9 million at June 25, 2023 from $1,198.8 million at June 26, 2022.

- Design-ins were $8.3 billion in fiscal 2023 compared to $6.4 billion in fiscal 2022.

We have made significant progress across all operational areas of the business and

will continue to focus on the enhanced delivery of financial performance progress in fiscal 2024. The Mohawk Valley Fab, which is the world's largest fully-automated 200 millimeter fab, began shipping product and contributed approximately $1 million of revenue in fiscal Q4.

\*\*\*

**Board's Role in Risk Oversight**

The Board, acting itself or through one or more of its committees, has general oversight responsibility for corporate risk management, including oversight of management's implementation of risk management practices. While the Board is responsible for risk oversight, management is ultimately responsible for assessing and managing our risk exposures. The Board directly oversees management's assessment, mitigation efforts and monitoring of strategic and operational risks, such as those relating to competitive dynamics, market trends and developments in the Company's industry, changes in economic conditions and cybersecurity. Senior management regularly updates business plans for each of the Company's product lines, including an assessment of strategic and operational risks and responses to identified risks, and members of the Board and senior management meet annually to review these plans. In addition, senior management reports to the Board at each quarterly Board meeting on progress made against these strategic plans, including an update on changes in risk exposure and management's responses to the changes.

The Board also fulfills its risk oversight role through its committees. Specifically, the Audit Committee charter assigns it the responsibility to review periodically with management, the internal auditors, and the independent auditors the Company's significant financial risk exposures, including the Company's policies with respect to risk assessment and Company-wide risk management, and to assess the steps management has taken to monitor and control such exposures. The Audit Committee regularly discusses material risks and exposures with our independent registered public accounting firm and receives reports from our accounting and internal audit management personnel regarding such risks and exposures and how management has attempted to minimize the exposures. The Audit Committee's primary focus is financial risk, including our internal control over financial reporting. Particular areas of focus of the Audit Committee include risks associated with taxes, liquidity, investments, information technology security, material litigation, and compliance. The Company has a Chief Compliance Officer who reports directly to our General Counsel and who attends Audit Committee meetings. The Chief Compliance Officer is responsible for the Company's global corporate compliance program, consisting of legal and regulatory policies and procedures, that includes employee training on how to implement and comply with these policies and procedures.

Under the direction and watch of the directors, the 2024 Proxy Statement was materially false and misleading because the above-referenced statements touted positive statements regarding the Company's financial outlook and risk oversight function, yet failed to disclose material adverse facts concerning the true state of Wolfspeed's growth potential and, in particular, the operational status and profitability of the Mohawk Valley fabrication facility which was known, or should have been known to the directors in the exercise of prudent business judgment. As such, the foregoing statements in the 2023 Proxy Statement were half-truths, meaning that the directors were required to (yet failed to) include all additional information necessary to make the statements not misleading. *See* 17 C.F.R. § 240.12b-20. As a result of the directors causing the 2024 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to re-elect certain directors to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company.

On January 31, 2024, the Company reported its second quarter results for fiscal year 2024. During the corresponding earnings call, the importance of the Mohawk Valley facility's ramp to the Company's success and progress thus far was detailed, stating, in pertinent part, the following:

> The Mohawk Valley Fab delivered improved performance and is on track to achieve 20% utilization in the June quarter. From a 200-millimeter substrate perspective, there is now ample runway to not only meet but exceed our original utilization target from Building 10 on the Durham campus as we're consistently producing high-quality, high-yielding 200-millimeter wafers out of this facility. The additional flexibility will be important as we begin producing substrates in the latter half of this year at The JP. Overall, I'm confident about our execution of our near-term operational goals and optimistic around our long-term financial prospects.

> Showing our unwavering focus on execution, the second quarter continued the solid momentum from the first quarter. We've said time and time again that all roads lead to Mohawk Valley, and this past quarter was no exception. The fab contributed approximately $12 million to our quarterly revenue, roughly triple last quarter's levels and at the midpoint of our guidance. I spent a lot of time at Mohawk Valley this past quarter and witnessed the dedication of our team firsthand, who, along with our incredible tool suppliers are working around the clock on tool optimization activities related to this first of its kind grant.

> Wolfspeed at its core is an innovative company, full of problem solvers, and I'm very grateful to the entire team that we are head sound and focused on execution at this fab. To give you a sense for the progress at Mohawk Valley, so far, we've qualified over a dozen customer parts, including 2 of our most complicated automotive devices, as well as the largest device we are currently producing at the facility. This gives us more than enough qualified parts to achieve our 20%

utilization goal, and we expect to continue to qualify more parts between now and the end of June, further supporting the Mohawk Valley revenue ramp.

\*\*\*

As a reminder, a design-in represents business we've been awarded. And the conversion to design win happens when the customer places production orders for 20% of the first year production volume. In other words, the design-win indicates that the customer is beginning to ramp their production with our devices. We achieved $2.1 billion in design-ins this quarter, marking our third highest quarter on record, which clearly indicates continuing and growing robust demand for silicon carbide.

More importantly, we posted a record of $2.9 billion of design-wins, which were heavily weighted towards EVs and included 28 different electric vehicle models. This diverse customer base across the global electric vehicle industry, with multiple OEMs and Tier 1s, gives us confidence to continue with our expansion plan and further illustrates why we believe our supply will be continuing to work to catch up with demand over the next few years. And these design-wins are just the beginning.

Over the next 5 years, based on our current design-ins, the number of EVs leveraging Wolfspeed devices will increase to nearly 120 different models across 30 different OEMs. This represents a significant growth from the small number of vehicles on the road using our silicon carbide devices today, and demonstrates the opportunity ahead for us. As we continue to pioneer 200-millimeter silicon carbide and embark on our unprecedented greenfield capacity expansion plans, we maintain conviction in our strategy. It is exciting to see what is on the horizon, and we look forward to continuing this promising momentum, particularly at Mohawk Valley, throughout the second half of this fiscal year and beyond.

\*\*\*

During the quarter, we generated record power revenue of $108 million, driven largely by the $12 million of contribution from Mohawk Valley and strong demand we see for our products. Looking at the power device revenue performance in more depth, we saw a sharp increase in EV revenue quarter-over-quarter, fueled by the additional EV device products shipping out of Mohawk Valley. However, this was partially offset by lower demand and persistent weakness in our industrial and energy markets, particularly in China and across Asia.

\*\*\*

We know from the more than 30 years of experience of working with this material

that the significant ramp required to create high-quality materials consistently at scale gives us a competitive advantage today and for the foreseeable future, especially as we begin producing 200-millimeter at The JP. The demand for silicon carbide remains significant, underscored by the 2 recent announced expansions of long-term supply agreements with existing customers. We expect to remain an important partner to other silicon carbide device manufacturers through the end of this decade. And we believe our leadership in materials provides a strong foundation for us to continue to grow our device business.

We are working closely across a diverse set of customers, which gives us good visibility into how the markets are evolving and where we can capitalize on the opportunity. Being the leader in silicon carbide, a truly transformative technology, is no easy task. And we are executing on this opportunity with efficiency, purposefulness and thoughtfulness. We look forward to bringing this vision into reality and generating long-term value for all stakeholders.

The question-and-answer segment of the call followed, during which Messrs. Lowe and Reynolds spoke further to their confidence in the current and guided progress in Mohawk Valley's ramp, pertinently in response to the following inquiries:

**Goldman Sachs Group Analyst:** I know you get asked this every quarter, but it sounds like the tone, the confidence, some of the data points you're throwing out there, Gregg, are as positive-sounding as we heard about the internal operationals [sic]. So given Building 10, it seems like you're ahead of plan. What is the potential for Mohawk to maybe pull ahead in the ramp to 20%? I know you're super confident in being able to hit it. But how do you potentially see upside to any of these medium-term targets? I think you've talked about $100 million of revenue from that facility by the December quarter.

So are there still internal bottlenecks operationally keeping you from accelerating? Or are there customer eval issues? Wondering, as you think about the upstream sort of not being as much of a limiting factor, how you could potentially maybe translate that to moving Mohawk Valley a little bit faster.

**Gregg A. Lowe:** Thanks a lot, Brian. So first off, the team has done -- the team up in Mohawk Valley combined with several -- the teams from Durham that have gone up to Mohawk Valley, has done an incredible job of relieving bottlenecks and fine-tuning the processes, et cetera. So very pleased with the progress we're making, still have a lot to do. But obviously, tripling the revenue and then doubling it again next quarter is fantastic. We feel great about where we're at with Building 10, obviously, now having an ability to support a greater ramp of 25% is fantastic as well. But as I said in the prepared remarks, we're going to keep the pace of the fab itself at the pace of 20% utilization in the June quarter, $100 million of revenue in

the December quarter. We feel real good about that. But again, from a longer-term perspective, the ability to get more out of the facilities on the Durham campus in terms of supplying Mohawk Valley, it gives us really good confidence in being able to take that number up higher out in time.

\*\*\*

**JP Morgan Chase & Co Analyst:** I guess, Gregg, you did mention the design-in pipeline, which continues to remain quite robust on the EV front. I was just wondering, I mean, what are you seeing change in terms of conversion of design-ins to design-wins, obviously, with the design-ins picking up in pace and potentially the launch of these sort of vehicles also coming more closer? Are you seeing a bit of any changes in the conversion rates of these design-ins to design-wins eventually? And just any color there that you can share will be helpful. And I have a quick follow-up after that.

**Gregg A. Lowe:** Sure. Good question. So this past quarter, we had a record conversion of $2.9 billion to design-win that represented, as I mentioned, there's 28 different unique electric vehicle models that are in there and a whole bunch of other products as well, including a number of industrial and energy applications. So we're really happy and very -- quite frankly, the design-win conversion we just had is quite a stunning number of $2.9 billion. So I feel real good about that conversion. And then the $2.1 billion of design-in gives us confidence that customers are still very excited about our technology and our capability.

\*\*\*

**William Blair & Company Analyst:** Well, congratulations. My follow-up question, so it's similar to what Brian asked you but with a slight nuance. So if I look at what Building 10 is outputting in terms of wafer starts and what you're pulling down on that in Mohawk Valley, my calculation would be that you will have an inventory of wafers over $200 million by June, assuming that the $25 million at midpoint and maybe a $50 million to $60 million or $55 million in June, my estimates on that. So my question is, as you look through the rest of the year, clearly, that gives you some guide in terms of Siler City ramp from a buffer perspective. But what are the -- is it missy kind of getting the second of a kind tools? What are the gating factors as you think about moving around that utilization to debottleneck and capture either more or less in the back half of this year and next?

**Gregg A. Lowe:** Thanks for the question, Jed. And I'll kind of talk first about my perspective on this and then hand it over to Neill. So you're exactly right that we are shipping out of the Durham facilities up to Mohawk Valley and obviously, we have inventory building up there in anticipation of the ramp. So no question about

that as we're trying to get ahead of things. So that's actually good news. And the way that we have the overhead track system and the storage up there it makes it perfect for that situation, number one.

Probably the more important aspect as it relates to buffering for The JP is the ability to ship up to 25%. Right now, we have very high confidence to 25% utilization out of the Durham campus. So that obviously gives us really good confidence. At this point, in the fab itself, about 75% of the tools have second of a kind tools, and we anticipate that the vast majority of the tools will have second of a kind tools by the June quarter of this year. So that will help debottleneck things because if a tool goes down, it basically stops production if there's not a second of a kind tool. So that's kind of what's happening there. Maybe I'll hand it over to Neill, if you want to add any additional color.

**Neill P. Reynolds:** Yes. So I think, Jed, what that means that there's no real change to the outlook right now. The key driver here, as we have talked about, is just ramping the revenue to $100 million by December quarter coming out of Mohawk Valley. And clearly, the inventory that we see coming out of Durham and Building 10 gives us good strength and good confidence that we'll have an available number of substrates to go drive that revenue through. So it will really be about how quickly can we get that throughput through the fab and out to customers over that period.

Now one other thing I'll mention is we also mentioned on the call here is we should be able to see Durham go from 20% to 25% equivalent utilization by December or towards the end of the year. So what that means is we'll be able to go above the $100 million a quarter as you get out into kind of that March, June 2025 time frame. So -- and then when The JP starts making meaningful substrate deliveries to Mohawk Valley, probably in the back half of calendar '25, we should have a nice glide path of substrates to support us out through that period. So we feel like, obviously, the demand continues to remain strong based on the customers that we have in front of us and it really just be about ramping, delivering substrates to the fab and continuing to drive productivity and output there.

\*\*\*

**JP Morgan Chase & Co Analyst:** I guess my follow-up was more on the industrial weakness that you're seeing and just trying to think about how to sort of extrapolate that to thinking about the June quarter as well. You are indicating you take a step down on power devices revenue related to that industrial weakness that you're seeing. But how are you thinking about how long that continues in terms of weakness? Is there an incremental step down in relation to that weakness you're seeing based on your current visibility? Just trying to get a sense of as Mohawk ramps, how do we think about sort of the offsets to that?

**Gregg A. Lowe:** So first off, industrial is definitely weak, as we had mentioned last quarter as well. And it is mainly driven by Asia and China, but it's weak across Europe and U.S. as well. And it's hard to tell when things are going to get better. But from a planning perspective, we're not anticipating it getting better this year, this calendar year. So we're just assuming it's going to be where it's at.

Now the industrial business is a really good business for us, and it will come back. And what we're doing in the meantime is we're ramping Mohawk Valley, which is almost targeted right now at automotive customers. So we will be ramping Mohawk Valley and driving that up. We're converting as much as practical out of Durham to supply for the automotive customers as well, but we are limited on the Durham footprint from that perspective.

But the good news is eventually, and we've all seen the movie, the industrial business will pick back up. And when it does pick back up, we will largely be an automotive output out of Mohawk Valley and giving us room then in the Durham facility to continue ramping when the industrial business picks back up. And again, we've gotten a lot of design-ins and a lot of design-wins there. It will come back up. That's a great business for us. We love the customers in that space. And we'll have ability out of the Durham facilities to handle that.

On March 4, 2024, Wolfspeed presented at Morgan Stanley's Technology, Media & Telecom Conference 2024. In pertinent part, Mr. Lowe again confidently reiterated their confidence in the demand landscape, responding to the moderator's questions as follows:

**Morgan Stanley Executive Director:** And the bottom line here is you're quite confident hitting the milestones for Mohawk Valley for the rest of the year?

**Gregg A. Lowe:** Yes, yes I am.

**Morgan Stanley Executive Director:** So maybe if we could talk to the demand side a little bit. I think you talked about 28 OEM wins. Obviously, you talked about the pipeline numbers. Those are really big numbers. And I guess, how do you think of those in terms of timing that they go to production timing that you can make announcements around those kind of exclusive wins that you have?

**Gregg A. Lowe:** We sort of have a funnel, so to speak, taking the opportunity that we have, the design ins that we have, the design wins that we have and then what the revenue is going to be. And at each of those stages, we take a pretty decent haircut just anticipating that the customer might not make 1 million cars, maybe it's going to be 500,000, or they're taking a brand from a run rate of 100,000 cars to 500,000 cars, and is that really viable? So we take haircuts on that sort of stuff.

We do the same thing with our China customers. We have great customers in China, where we've got pretty decent exposure to the auto industry there. But it's sort of in the country's interest to try to foster internal capabilities. So we make an assumption that more of that is going to possibly go away. Despite taking all of those sort of judgments, we still have a demand scenario that is substantially higher than our supply for the foreseeable future.

I think there's going to be lots of fits and starts. I think you're going to see surprising winners. You're going to see surprising losers. Like if you look at the top 10 automobile companies in the world today, 2 are Chinese despite the fact that China is the world's largest market for cars. And by the way, they occupy #8 and 10. If you look at battery electric vehicles, they're 5 of the top 10, including 1, 3 and 5. So most likely, if you look at the top 10 car companies in 2030 and you compare it back to 2020, I think there's 5 new names. And maybe they're not all Chinese, but probably one of them will be. Probably one of them is going to be Tesla. There's going to be a lot of change in churn in the auto industry. This is the biggest disruption in the history of the car. Brakes and traction control and power steering and all of that has -- was nothing compared to what's happening.

**Morgan Stanley Executive Director:** Yes. And there's definitely the sense that the momentum on EVs has shifted to China a little bit. And in the U.S. and in Europe, you have a lot of companies that are dedicated to EV, spending a lot on EV, and this is where our auto team gets a little bit cautious of like if they focus on internal combustion, the stocks are materially cheaper, right, because they're not making these big investments and questioning some of those investments. So I guess, how do you think -- and again, that's one view. I'm not saying that's right, but how do you guys think about that? And does it matter if we see programs here and there that sort of shift back towards...

**Gregg A. Lowe:** First off, it's not going to matter to us because the supply is not meeting the demand right now, so we'll just be able to shift it. There might be a quarter where we're running with this one part and we need to shift it to a different part. We have a lot of fungibility though, so we probably are not going to see that. But I would say a couple of things.

First off, you heard me say it earlier. This is the iPhone moment for the Western world. And they're either going to shine or they're going to go away. And I don't think this is a stoppable reversible pattern. Second, most Western car companies got rid of all the people developing anything internal combustion engine technology development wise. So new engine technology, new -- any of this kind of stuff, they stopped developing that 4 or 5 years ago. And it -- you're not going to have the doover moment, I don't think, for this. They may produce those same cars for a

little bit longer, but they're not going to meet any of the EPA guidelines or any of that kind of stuff. So there's going to be a lot of issues. And like I said, they stopped development of that technology and I just don't see a do over possible at all.

Yes. It's going to be highly disruptive. Winners, losers. Forecasts are going to be changing. It doesn't really matter to us for the foreseeable future.

On May 1, 2024, Wolfspeed published its results for the third quarter of fiscal year 2024. In the corresponding earnings call, Messrs. Lowe and Reynolds spoke to the current state of the Company and the alleged misperception by its investors, stating, in pertinent part:

First, we believe the market is not fairly valuing the company, consistent with the technology and the business we have built or the strategic potential of the business. The management team and the Board of Directors are focused on this disconnect and routinely consider alternatives to enhance value for shareholders.

Second, driving better financial performance and value for shareholders by delivering on our near-term operational commitments for fiscal 2024 and 2025 is at the core of every decision we make. We are laser-focused on increasing the utilization at Mohawk Valley, and as I'll talk about in a few minutes, we are making solid progress there. We are also focused on bringing The JP online, where we are, likewise, making solid progress on that project.

Third, our operational road map provides sufficient time to focus all of our efforts by making sure Mohawk Valley and the JP are on track before we move on to new project, which is not only good for investors, but for our customers who are also counting on us to meet our commitments. At this time, there are not any additional greenfield projects scheduled to launch until we demonstrate further progress on our existing project, and we expect to significantly reduce CapEx for fiscal 2025, ahead of receiving any grants or funding from the U.S. government.

Finally, we are deliberately and effectively allocating capital

\*\*\*

We made strong progress at Mohawk Valley in the third quarter, more than doubling our revenue and delivering $28 million of product to customers from this fab. We are on track to achieve 20% wafer start utilization in Mohawk Valley by June of this year. And to give you a sense of the progress we're making as of April, we are already at more than 16% utilization based on wafer starts per week, making us extremely confident on our ability to achieve our target in June of 2024.

\*\*\*

As we mentioned last quarter, we continue to be a key supplier of silicon carbide substrates to the broader market, as evidenced by the 2 supply extensions that we announced in January. Our LTAs underscore the importance of our role as the leading provider of high-quality 150-millimeter substrates to the market, and we will continue to be an important partner to our customers in the years to come.

\*\*\*

While Mohawk Valley, which currently services almost entirely EV customers, is something the I&E market or industrial and energy market remains challenged and remains weaker than our original expectations, primarily due to inventory buildups across many end market channels predominantly in the Asian markets.

We are responding by shifting I&E capacity both in Durham and Mohawk Valley towards EV. Our ability to shift our production from I&E to EV speaks to the flexibility that our business model provides us. However, this end market shift and change in product mix will have a short-term headwind on our gross margins, but it will position us well for fiscal 2025, as we could see the start of a recovery for the I&E demand at some point during this period.

Unlike I&E, we continue to see a ramp of EVs that have adopted our silicon carbide devices. While this is a disruptive time in industry, and we continue to see OEMs adjusting and modifying their near-term EV production plans, we remain substantially supply constrained for our silicon carbide devices. As demand remains well above our current supply, we can be nimble and shift much of our supply to other customers to accommodate for these near-term changes.

Underscoring this continued EV demand is our strong design-in and design-win performance this quarter. As a reminder, a design-in represents business we've been awarded which converts to a design-win once we begin ramping into initial production. This quarter, we achieved approximately $2.8 billion of design-ins, about 80% of which was for EV applications, marking our second highest total on record and totaling over $7 billion of design-ins for fiscal 2024.

\*\*\*

We remain confident in our long-range financial targets. As the underlying economics, we are seeing so far for Mohawk Valley and Building 10 demonstrate that our purpose-built, vertically integrated greenfield approach to capacity expansion will generate strong revenue and profitability.

In combination with the JP, Mohawk Valley will be able to produce more than $2

billion of device revenue, in addition to the $400 million of device capacity currently installed in our Durham device app. In addition, with the JP online, we have the potential to grow the material substrate business to greater than $600 million. Lastly, short-term revenue and gross margins are being impacted by slower industrial and energy markets.

In the short term, we are pivoting our available capacity to EV products, where EV product demand continues to outstrip our available capacity to serve that demand. The outcome of this will be more muted revenue growth and low gross margin for the next few quarters. As Gregg mentioned earlier, it positions us for any potential recovery in I&E, most importantly, it does not impact our longer-term plans to achieve our revenue and EBITDA targets.

We believe that it will be at least the second half of this calendar year before we see inventory levels return to normal. But as we said last quarter, much of the product we had already produced and slated to ship at the match elsewhere in our pipeline. And we are continuing to work to find the best match for that inventory now.

During the question-and-answer segment of the call, Messrs. Lowe and Reynolds fielded questions relating to the electronic vehicle landscape and their automotive demand pipeline, particularly in the following pertinent discussion:

**William Blair & Company Analyst:** Thanks. I just wanted to dig into, Gregg, your comments on demand, which seems strong for you in EV. Just in the materials business, with that business coming down so much. So if I kind of take your guide on a quarterly basis, it's come down about $40 million per quarter. Why aren't materials ramping complement to that? Because I would assume that, that opens up the 150-millimeter wafers to sell to other customers.

**Neill P. Reynolds:** Sorry, Jed. So in terms of the -- how we think about that, right now, the end market demand for automotive in terms of EV customers. So there's a lot of changes that Gregg talked about in terms of the OEM landscape. The amount of demand still outstrips our supply. So it's really important for us to continue to take as much capacity as we can serve those customers. In the meantime, we'll continue to drive our materials business. As you know, we've got a lot of long-term agreements there that underpin our revenue for a long time. And I think that the $99 -- $90 million to $95 million per quarter will continue to service that market, I think, in terms of how it's kind of laid out today. I think it's very important that we continue to service our automotive customers at this time. And we're going to continue to understand...

**William Blair & Company Analyst:** Neill, maybe I didn't ask the question

clearly, but it's $40 million coming out of Durham on the devices side, where you're supplying the 150-millimeter wafers internally. Why wouldn't you be able to see a $12 million increase in the materials business?

**Gregg A. Lowe:** Yes. So maybe I'll take a crack at that. I don't think I understood that could be your question. So a couple of things. Obviously, we have automotive demand that is higher than our current supply. So transitioning that capability from I&E to automotive is a very important customer satisfaction item that we're focused on. The automotive devices are larger than the industrial products. And substantially, most of the industrial products are sold in packaged or module form. And they get the exact opposite for automotive. For automotive substantially, most of the product that we sell is in die form. So we're not adding value, we're adding incremental revenue potential for the same amount of, I'll call it, silicon carbide millimeters [indiscernible].

So it's not a one-to-one trade-off when you move from an industrial part to an automotive part in the fab itself…

On June 24, 2024, Wolfspeed announced that the "Mohawk Valley silicon carbide fab has reached 20% wafer start utilization, a critical step in the Company's efforts to meet the growing demand for silicon carbide power devices." The Company additionally announced that its "Building 10 Materials facility [at Durham] has achieved its 200mm wafer production target to support approximately 25% wafer start utilization at the Mohawk Valley fab by the end of calendar year 2024." Wolfspeed's "next utilization milestone for Mohawk Valley" was slated to be unveiled "during its fiscal Q4 2024 earnings call in August."

On August 21, 2024, Wolfspeed unveiled their fourth quarter fiscal year 2024 results and conducted an associated earnings call. During the call, Messrs. Lowe and Reynolds spoke at length about their progress and forecasts as they continue to claim the market is undervaluing the company. In pertinent part, they provided the following information:

As we've discussed previously, our 200-millimeter device fab is currently producing solid results at lower costs than our Durham 150-millimeter fab while also presenting significant die cost advantages. This improved profitability gives us the confidence to accelerate the shift of our device fabrication to Mohawk Valley while we assess the timing of the closure of our 150-millimeter device fab.

\*\*\*

Crystal growth and substrate processing out of Building 10 in Durham continues to scale, and we expect to be able to support a 25% wafer start utilization at Mohawk Valley in the September quarter, 1 quarter ahead of plan. As a result of continued productivity improvements, we are also now expecting Building 10 to support 30%

wafer start utilization at Mohawk Valley in the March quarter of 2025.

\*\*\*

Lastly, as I outlined last quarter, the market is clearly not valuing the company consistent with our technology, the business we've built or the strategic potential of the business. In light of this disconnect, the management team and the Board of Directors routinely consider alternatives to enhance value for shareholders. Having laid out those points, let's move to the specifics of Wolfspeed's fourth quarter performance.

The Mohawk Valley Fab generated $41 million in revenue for the quarter, on the lower end of our estimated range, which was the result of an EV customer deferring delivery of several million dollars' worth of product. We expect to recognize this revenue in fiscal 2025 and believe we would have landed in line or slightly above the midpoint of our Mohawk Valley revenue guidance excluding this push-out.

We passed internal qualification for nearly all automotive powertrain products in late July and now have only a handful of customer qualifications left to complete, giving us the confidence that those products can be serviced out of Mohawk Valley sooner than we originally anticipated.

While the ramp of EVs is slower than previously projected and many companies in the semiconductor industry are still confronting automotive headwinds, our revenue in the EV market continues to be strong because we are just at the beginning of the ramp of our automotive business across several geographies.

Our EV revenue in the fourth quarter was up more than 100% year-over-year and is expected to be up approximately 300% year-on-year in fiscal Q1. We are in the very early stages of what might be the most significant transition in the history of the auto industry. This will create a very dynamic environment as the OEMs will continue to adjust their ramp programs across their EV product portfolio.

Our EV revenue has grown for 3 consecutive quarters despite a declining auto semiconductor market because some of the EV design-ins we've accumulated over the last 5 to 7 years are just beginning to ramp. We achieved an additional $2 billion in design-ins in fiscal Q4, bringing our fiscal 2024 total to over $9 billion of design-ins.

\*\*\*

We generated $201 million of revenue for the quarter, slightly above the midpoint of our guidance and flat sequentially. We recognized power revenue of $105

million, driven largely by the contribution from Mohawk Valley but offset by continued weakness in industrial and energy markets. Mohawk Valley's $41 million contribution represents growth of 46% quarter-over-quarter and an exponential increase from the $1 million contribution 1 year ago.

We achieved $64 million of revenue from our Durham device fab, down approximately 40% year-over-year, driven by continued weakness in industrial and energy markets. We also recognized materials revenue of $96 million, above our expectations, driven by the continued strong execution of our materials operations team.

\*\*\*

Moving on to our guidance for the first quarter of fiscal 2025. We target our revenue to be in the range of $185 million to $215 million. We target roughly $50 million to $60 million of this revenue to come from Mohawk Valley next quarter, up more than 34% from the prior quarter and up greater than $50 million year-over-year at the midpoint of our range versus the $4 million we achieved last year at this time.

The question-and-answer portion of the call followed where Messrs. Lowe and Reynolds clarified their plan to shutter the Durham fabrication facility and their confidence in absorbing that revenue through the Mohawk Valley facility, stating, in pertinent part, the following:

**JPMorgan Chase & Co Analyst:** This is Joe Cardoso on for Samik Chatterjee. Just curious, like the potential closure of the Durham device fab would be quite a shift in strategy relative to prior closures. I think $400 million of revenue was coming from that footprint when it's fully loaded.

So just curious if you could just dive into that or flesh it out a bit more, what the exact thought process here is to close -- around closing that fab and take it out of the long-term model, and then maybe the second part of that question is, what does that imply for the existing footprint there in Durham?

**Gregg A. Lowe:** Thanks for the question. First, it was always the plan to ramp down 150-millimeter and transition to 200-millimeter. What's really made this decision very straightforward is the progress and productivity we're seeing across the entire 200-millimeter platform: output from Building 10 now able to support 30% wafer start utilization; yields in Mohawk Valley ahead of plan; the economics of Mohawk Valley substantially more compelling than Durham; and finally, we're on scheduled to ramp The JP and seeing great results from the initial crystal run.

So combine this with the fact that the industrial and energy business is down, starting this process of transitioning the fab when we're not swimming upstream

against the whole bunch of demand from I&E certainly gives us breathing room to make this happen. The key decision though, was all about the progress and productivity that we see across 200-millimeter. We're super excited about that. It's actually quite an amazing accomplishment that the team has been able to do. And Neill, you can get into a little bit of detail, but that progress and productivity also gives us ability to absorb that revenue in our current footprint.

**Neill P. Reynolds:** So let me just break down a little bit just a bit of the capital efficiency that we're seeing. So one thing I talked about is kind of taking the CapEx level down from $1.2 billion to $1.4 billion during fiscal year 2025 and then dropping it down dramatically in fiscal year '26.

So I think as Gregg said, the facility spend being complete, we can really modulate our CapEx for tools going forward. And that facility will be -- the facilities costs will likely be complete by December of this year. So we plan these factories for great economies of scale, building up modularly, and we're starting to see the benefits of that as we start to exit that facility spend.

The second thing is our capital investment model is working as expected. So the good yields and the efficiency across the 200-millimeter supply chain is just resulting in a lower required amount of CapEx for each incremental dollar of revenue. So we're seeing some good performance there. So when you think about what that would mean longer term for the revenue, Joe, as you start to think about moving on beyond the Durham fab one day, that $200 million to $600 million of fiscal year 2026 CapEx could support 50% to 60% utilization out of Mohawk Valley.

So I think it's a real testament to the amount of revenue we can absorb through Mohawk Valley when you start making that trade from 150-millimeter to 200-millimeters. So I think here, in the medium term, if we go down that path, I think Mohawk Valley will have significant capability to absorb a lot of that revenue. And of course, the trade-off from industrial and energy from 150 to 200 is actually a very, very good mix shift from that perspective.

So we believe that the Mohawk Valley fab will really be able to incorporate a lot of that revenue just mentioned, and we'll -- as we tighten up these plans and give more of an update, we'll let you know how that impacts the long-term model, but we're clearly bullish on the ability of Mohawk Valley to absorb that.

\*\*\*

**TD Cowen Director:** I wanted to ask about the Mohawk Valley ramp and time lines to revenue. Is the right rule of thumb still when you reach those utilization

levels, you get revenue, I think it's roughly 2 to 3 quarters later? Because that would imply that you're, in the fiscal third quarter of 2025, a number comfortably above $100 million out of Mohawk. And then maybe as a follow-on to that question, what's the time line to get to the 30% beyond that? And how does that coincide with The JP layering in as well?

**Neill P. Reynolds:** Yes. So first of all, thanks for the question. And I think as we've laid out before, there's -- from a utilization perspective, there is a couple of quarter lag between the time you start a wafer to the time we start to see revenues kind of get processed through the fab and then through the back-end operations as well and then eventually out to customers. So the time frame you laid out is correct.

The other thing that impacts utilization and translation into revenue is the mix between automotive parts and in industrial and energy parts. The revenue per wafer, so to speak, is just much higher than industrial and energy part generally than an automotive part.

If you look at the Mohawk Valley revenue just for the June quarter, for instance, we were 85% to 90% EV. If you transition that into the September quarter here, we'll be 95% plus EV and we expect it to remain that way as we push more and more of our qualified parts to Mohawk Valley.

On the flip side, we'll just see the Durham Fab consistently see the EV percentage of revenue start to come down over time. So as that translates into revenue, I think we talked about it. With heavier auto, 20% translates closer to $80 million and close to $100 million is the kind of the normal mix. So I think that's the way to think about it moving forward.

Now as we think about maybe transitioning to Durham fab, we've put a lot more industrial and energy revenue into Mohawk Valley, which as I said before, will be a good trade for us. And then we get back to the kind of, I think, normal economics of thinking about a $2 billion fab and the percentages of supply that are capable at various levels of utilization.

*** 

**Morgan Stanley Executive Director:** I think you gave an EV number in terms of the percentage growth, but I didn't hear an absolute number. I wonder if you could help us kind of size where you are now with EV and what you're classifying as EV.

**Neill P. Reynolds:** Yes. So on the EV revenue, as you said, EV revenue was up 2x in the quarter, 3x year-over-year in the outlook for the September quarter. It's also gone, by the way, from representing about 25% of our power device revenue a year

ago to over 50%, even the mid-50% of our power device revenue here in June. And if you look here in the September quarter, more than 60% of our power device outlook. So we expect that to grow even further as the year goes on.

So while we've seen some moderation, I would say, the overall EV growth rates, this has been well documented and reported and supply and demand are more matched up, we do continue to see some significant growth into the December quarter and into the first half of calendar year 2025.

On September 4, 2024, Wolfspeed presented at Citi's 2024 Global TMT Conference. During the question-and-answer presentation, Messrs. Lowe and Reynolds again addressed Mohawk Valley's purported success and continued ramp while speaking to Wolfspeed's poor stock performance throughout calendar 2024, stating as follows:

**Citigroup Analyst:** Gregg, if I can start with the kind of the big question investors have, why do you think your stock price has underperformed by so much this year? What are the investors missing?

**Gregg A. Lowe:** Well, a couple of things I would say. Obviously, one of the things we've been working on over the last 6 quarters is getting the operations in better shape. That's been a very, very key focus of me. I've been in Mohawk Valley. I've been in our materials factories pretty consistently during this time. And I think one thing that I think is -- not one thing, but several things have happened.

Number one, Mohawk Valley has now turned into a very good asset for us in terms of production quality, yield, et cetera. Feeding Mohawk Valley out of Building 10 has also substantially increased. We announced that we hit 20% utilization in Mohawk Valley and that's because Building 10 was able to deliver the material to them. And we also announced on our last earnings call that Building 10 will actually be able to support a 30% utilization in Mohawk Valley, which is a 50% increase off the same number of growers. So which -- maybe it's not that obvious, but that means our yield out of those growers is 50% better than anticipated. The yields in Mohawk Valley are now ahead of where we intended -- not intended, where we expected them to be at this point, and we still have quite a ways to go to get to what we call entitlement yield.

And then finally, I think something that should not be lost on investors is that our cost out of Mohawk Valley is substantially better than our cost out of Durham. All of this confidence that we have now in our 200-millimeter entire supply chain, Building 10, Mohawk Valley, et cetera, has given us the confidence to announce that we would be shutting down our 150-millimeter line in the Durham facility. We don't have more details right now to give on that. We will give you a detailed plan on that at our next earnings call. But that process is underway, I think.

So I think there's -- for the last 2 years, there's been a question of, can we get 200-millimeter going? And I think that answer has been -- that question has been answered pretty substantially. . . .

**Citigroup Analyst:** Great. And let's just unpack a little bit. You guys mentioned Mohawk Valley, Durham, CapEx. Let's start with the Mohawk Valley fab. Gregg, you're expecting Mohawk Valley fab to reach 25% utilization in September quarter, which is one quarter ahead of the original plan.

What gives you the confidence that you kind of remain on this trajectory of getting to higher utilizations. If you guys just take us to the ground and talk about what changes and improvements have you made where the yields are tracking better and everything?

**Gregg A. Lowe:** There are lots of different angles on this. So -- and I don't have the exact numbers, but the number of tools that have a second tool in the factory is substantially higher than we were certainly a year ago. And I believe we're on track to be fully second of a kind tool by the end of this calendar year. I don't remember where we're at right now, it's pretty high. So that used to be pretty substantially low, like 25%. So anytime one of the tools that only had one-of-a-kind tools went down, it just stopped production.

So we now have multiple tools across the fab, which is good. I think our ability to understand how the tools are going to respond to 200-millimeter silicon carbide has gone substantially up, and that means our maintenance and R&M processes and things like that have gotten a lot better.

Just recall, this is the first 200-millimeter silicon carbide factory. So every single one of those pieces of equipment in this factory saw silicon carbide for the first time, and we had to kind of fine-tune that. And I think that's gone very, very well. If you look at the yields across the products that are going through Mohawk Valley, we've got a very strong kind of up into the right trajectory. And as I said, we're currently ahead of our planned yield on the device in Mohawk Valley.

And then the second thing and it's really important is the output out of Building 10. The JP is coming along very well. It's on time, it's on track. But any time you bring on a new facility, there could be some kind of problem. Basically, that hasn't happened. But Building 10 being able to do 30% versus 20% is a huge relief in terms of time that we need to get the JP on board. The JP has initiated first crystal growth. I personally did it on the first machine. The parts are coming out, looking great. They're matching the quality that we're seeing out of Building 10. We fully expected that because the facilities are not too far away from each other, about 45

minutes, plus or minus a little bit.

And so the team that started up Building 10 is the exact same team that started up the JP. And recall that Building 10 was a squash board, a basketball court, office space, and we turned that into a crystal growth factory. We certainly expect a grounds-up purpose-built facility at the JP to be a lot easier to bring up because we're not dealing with what used to be a squash court that's now trying to be a factory. So we feel real good about it. So quite confident in that. And again, the confidence should be heard loud and clear because we are cutting the cord to 150. And we're very, very confident in the 200-millimeter.

\*\*\*

**Unknown Analyst:** The first question, I guess, on utilization, you guys are talking about 25% next quarter. And then from your earnings call, you talked about 40% sometime mid next year. The trajectory seems a little slow compared to what we've seen on some other silicon fabs, and I understand silicon carbide. Are you essentially limited by Siler City ramping up or you're doing a slow ramp for some other reason?

**Gregg A. Lowe:** Well, a couple of things. So first off, we made the announcement that Building 10 can support 30% utilization. And at the same time, we said we're starting to grow crystals in Siler City and that project is on time. So I think those 2 things are actually very positive for our ability to ramp the fab. We've mentioned that our fab yields are ahead of what our plan is, but we still have ways to go from an entitlement perspective.

So having a more modest ramp is going to be helpful in terms of we'll get more out of the chips as our yields continue to improve. And so I think the -- I think we've got a good ramp plan. And I think that plan has been successful over the last 6 quarters where we went from essentially no revenue. I think it was $1 million a year ago last quarter to basically $40-plus million. So I think the ramp has been a very good ramp for us, and I think the plan that we have going forward is good as well.

**Unknown Analyst:** Got it. Just a quick follow-up on that. How should investors think about risk on utilization ramp like, for example, going from 0% to 20% versus 20% to, let's say, 60%…

**Gregg A. Lowe:** Yes. So in terms of the things you need to deal with, 0% to 20% is a lot harder than 20% to 40%. There's no question about it, especially if it's never been done before. And that's what we faced. So all of those machines, as I said, we're seeing silicon carbide for the first time. So we anticipate that it will be a smoother ramp from 20% to 40%. And again, we're in the process of improving

yields, improving cycle time. So I think we'll -- I think it will be a good -- I think we've got a good plan.

The above-referenced statements were false and/or materially misleading. The false impression was created that the Company possessed reliable information pertaining to the its projected revenue outlook and anticipated growth while also minimizing risk from seasonality and macroeconomic fluctuations. In truth, the optimistic claims of the potential and growth of the Mohawk facility and general demand for the 200mm wafers in the electronic vehicle market fell short of reality; the demand for the Company's key product had been overstated and undue reliance was placed on purported design wins while the facility's growth had begun to taper before even recognizing the $100 million revenue per quarter allegedly achievable with only 20% utilization of the fab, let alone the promised $2 billion revenue purportedly achievable by the facility.

## THE TRUTH EMERGES

On November 6, 2024, after the market closed, the Company released its first quarter results for fiscal year 2025 and conducted a corresponding earnings call to discuss the reported slowdown and reduced guidance. In pertinent part, Mr. Lowe discussed the Company's setbacks and detailed the steps they are taking to reduce costs going forward:

> I'll now address how we're simplifying our business and focusing on our 200-millimeter device platform, lowering our cost structure and capital requirements to accelerate the path to profitability. Wolfspeed is the first silicon carbide company in the industry to transition its entire device business to 200-millimeter. This strategic move is driven by superior yields, improved IPOs and overall enhanced economics that we're seeing in our 200-millimeter platform. This will allow us to utilize our capacity more efficiently due to more automated manufacturing at our 200-millimeter Mohawk Valley fab versus our very manual 150-millimeter Durham fab. This will enable us to eliminate redundancies, significantly improving gross margins.

> The transition to a fully 200-millimeter device platform also provides opportunities to streamline our organization and lower our operating expenses. Considering the slower growth of EVs adoption and the continued weakness in industrial and energy, the steps we are taking will rightsize the business and generate additional cash savings.

> These steps include: first, we have begun to execute our plan to close our 150-millimeter device fab on the Durham campus. This closure will be a phased process over the next 9 to 12 months, and we are currently working with customers to finalize the transition time frame.

> Second, we are optimizing our capacity footprint by closing our epitaxy facility in

Farmers Branch, Texas and indefinitely suspending our construction plans for the next device fab in Saarland, Germany. We expect to ramp down final production in Farmers Branch by the end of this calendar year.

Regarding Saarland, we have spoken with government officials and Zeta and they understand that we would need to see a clear acceleration of our customer demand and additional capacity requirements before we would reconsider construction at the site. While we are indefinitely suspending our activities in Saarland at this time, should we determine to build a fab in the future, the in-store site remains our preferred site in Europe.

Third, we have implemented a workforce reduction in our administrative and other business functions. This reduction, along with the factory closures, will impact approximately 20% of our total employee base. This reduction will better align our business with current market conditions and customer demand. These facility and head count restructuring initiatives are targeted to generate annual cash savings of approximately $200 million, significantly improving our projected cash flow from operations over time. These actions will foster a stronger, more agile company, ready to seize the opportunities ahead. Many of these reductions have already occurred, and we expect to complete the majority of the actions by the end of the year.

And lastly, we are further reducing our fiscal 2025 CapEx guidance range by an additional $100 million to a new range of $1.1 billion to $1.3 billion, excluding federal incentives. This reduction will align the pace of our CapEx spend with the broader shift in EV and I&E market demand that we are currently observing.

***

As we stated in the past, we are in the very early stage of the most significant and disruptive transition in the auto industry. While this creates a potential for significant growth and opportunity in the long term, it will also result in a dynamic environment in the near term. As with any disruptive technology, we are seeing EV customers revise their launch time lines as the market works through this transition period. This push out in anticipated EV demand does not reflect diminished confidence in the long-term demand for the adoption of EVs.

***

Although demand is expected to ramp more slowly than we originally anticipated, we are continuing to win our share in the EVs marketplace.

***

For the industrial and energy sectors, we are seeing continued softness, primarily due to broader macroeconomic pressures, including higher interest rates and the rising cost of capital, which have delayed investment cycles and contributed to a slower recovery for this sector. These conditions also resulted in shorter lead times and limited visibility throughout the broader supply chain. While the industrial and energy end markets have remained challenged with orders remaining weak, we are seeing an increase in end customer demand as inventory levels in the market are starting to decline. As such, we expect the market will begin to recover in the first half of calendar 2025, and as we see broader market conditions further stabilize and move forward to a recovery, we'll be prepared to support the increased demand.

Now let's take a minute to cover the great progress we've made in building out our 200-millimeter footprint. For the first time, the revenue from our 200-millimeter fab at Mohawk Valley exceeded the revenue from our legacy Durham fab in Q1. While this revenue was lower than originally anticipated due to market demand and customer pushouts, we continue to see great performance out of the fab with yield and cycle times ahead of plan, and anticipate future improvements as we ramp the fab.

Mr. Reynolds further elaborated on the financial details of alleged decline in demand and the plan to cut costs to match such reduced demand, stating, in pertinent part, the following:

Given the higher yields and efficiency of our 200-millimeter production in both substrate and fast stages, in conjunction with a weaker short-term market outlook, we will lower our capital expenditures in fiscal year 2025 to $1.1 billion to $1.3 billion. This is a reduction of $100 million versus our prior guidance. This will allow us to largely complete our facility build-out at the JP and Mohawk Valley while being more prudent with tool expenditures in order to match supply output with market demand. However, with the facilities largely complete, we will be poised to respond with tool installations to expand capacity and serve our customers when demand reaccelerates.

Now that we have made the decision to move our power device business fully to 200-millimeter, this will allow us to restructure our company to significantly simplify our operating model, lower our non-GAAP EBITDA breakeven point and exit assets we will no longer require for production. As Gregg discussed, we have a variety of operational and headcount restructuring initiatives that are already underway to reduce our overall cost basis and streamline operations. These actions upon completion are targeted to generate annual cash savings of approximately $200 million. This restructuring will be cash neutral in fiscal year 2025 and start generating a large portion of the $200 million of annual cash savings during fiscal year 2026.

As part of this program, we expect to recognize total restructuring charges of approximately $400 million to $450 million over the next several quarters, including $87 million in charges recorded in Q1.

\*\*\*

To expand a bit on the restructuring initiatives that Gregg mentioned. First, as a result of our successful transition to 200-millimeter, we are in the process of closing our Durham 150-millimeter device fab. This decision underscores our confidence in 200-millimeter technology and a superior yield, better die costs and overall improved economics. It will be a phased closure, which we expect to complete by the second half of calendar 2025. We expect revenue contribution from the Durham fab to continue for the next 4 quarters with the expectation of a gradual phasing out and transfer of revenue to Mohawk Valley over time.

\*\*\*

Finally, we are implementing a reduction to our overall nonfactory workforce. And this, along with the factory closures, will impact approximately 20% of our total employee base. The majority of these workforce reductions will be completed by the end of this calendar year. We expect to see lower operating expenses and immediate savings in the current quarter and beyond.

\*\*\*

Now moving on to our quarterly results. We generated $195 million of revenue for the quarter, slightly below the midpoint of our guidance and down 3% sequentially. We recognized power revenue of $97 million, down quarter-over-quarter, driven largely by lower demand in the industrial and energy sectors. Revenue contribution from Mohawk Valley was $49 million, up more than 20% quarter-over-quarter but at the lower end of our range due to lower customer demand within the quarter. We also note that this is the first quarter that Mohawk Valley contributed more power device revenue than the Durham fab and with higher yields and consistent operating execution remains poised to deliver higher levels of revenue in future periods.

\*\*\*

Finally, turning to our Q2 2025 guidance. We target Q2 2025 revenue to be between $160 million to $200 million, reflecting the current macro environment and our demand visibility related to EVs. We continue to have ongoing customer demand discussions that we expect to provide more clarity for calendar 2025 as we complete the quarter. The rights revenue at Mohawk Valley is targeted to be between $50

million to $70 million for Q2.

A question-and-answer segment followed the prepared remarks, during which Messrs. Lowe and Reynolds discussed the potential lost revenue caused by shuttering the Durham facility and their ability to meet CHIPS act milestones insofar as they relate to the Mohawk Valley facilities' growth ramp. In pertinent part, Messrs. Lowe and Reynolds responded to the following inquiries, touting their "solid" plan:

**JPMorgan Chase & Co Analyst:** This is Joe Cardoso on for Samik. I was wondering if you could provide a bit more color on how you guys are envisioning the magnitude and timing relative to the revenue ramp down of the Durham device fab and the impact to your top line through the next year. And as you talk to customers around transitioning the capacity that you're currently running out of Durham to Mohawk, what's your sense on the appetite to transition this capacity versus perhaps customers potentially being more reluctant to do so? Basically, just curious if there's any concerns around not being able to capture all of that as you try to transition it from Durham to Mohawk.

**Gregg A. Lowe:** Yes, thanks. So I'll kick it off and then maybe Neill can give a little bit more color. Obviously, anytime you transition from one fab to another, the customers have an input into that, we're engaged with them. I think the thing that's very different in this particular, situation is that we're moving from a very manual optimized fab to a new, highly automated fab that we believe is going to produce as well, is producing better results and -- out of the tab in North Carolina and also have a higher quality since there will be less manual interventions in that fab.

We're already engaged with customers on that. We've got a pretty solid plan. I think we're transitioning the vast majority of the revenue up to the factory. There will be some parts that don't transfer, but the vast enough amount of revenue is planning to transfer to Mohawk Valley. I would note that all of our powertrain customers that we're shipping to, to today currently have already been qualified and the best that is shipping already out of Mohawk Valley. So that transition was well underway.

**Neill P. Reynolds:** Yes. And just from a revenue perspective coming out of Durham, right now, we are starting to ramp down our automotive products at Durham. That's already well underway. I think from an industrial energy perspective, as Gregg mentioned, we qualified in both auto and nonauto parts, a very significant amount already at Mohawk Valley. So we'll just transition those parts up there.

So as we move into the second half of the year, the fiscal year, we really just think about it from a market perspective, we'll lower revenue, particularly in the Durham

fab in this quarter. We'll burn off some inventory. We'll see how that rebound in the second half of the year just driving more towards Mohawk Valley. So we'll see Mohawk Valley revenue continue to increase and Durham kind of come down over the following quarters. At least that's kind of our forecast for today.

What we can tell is some customers may make some end-of-life or later purchases in the fab. We don't have that baked in yet, but we'll wait to see how those kind of play out. Our expectation is we're going to see a lot more revenue at Mohawk Valley coming forward as Durham starts to come down during the next 9 to 12 months.

***

**Canaccord Genuity Corp Analyst:** On the recent call, you did around the CHIPS Act, you had mentioned some operational milestones that you had to meet in order to qualify for subsequent tranches. Can you just give us a little bit of color on what those milestones are and your confidence in achieving them given the situation that your fundamentals occur?

**Gregg A. Lowe:** Yes. The near term -- the first tranche, and Neill will go through a little bit of detail in terms of what that first tranche means. We've got pretty good -- I would say we've got very solid line of sight to hitting the milestones that are going in for the first milestone that we need to hit.

**Neill P. Reynolds:** Yes. So I think from an operational perspective, we're in good shape. And as it relates to that first tranche, in addition to the -- as I mentioned earlier on equity convertibles, essentially, what you're talking about is 20% to 25% of that first tranche coming in that would also include the next tranche of the debt financing for another $250 million. So I think between the capital raise and the refinancing, the direct disbursements related to the debt financing will drive a significant amount of capital in [indiscernible]. So I think on all fronts, I think we've got a very solid plan here.

The aforementioned press releases and statements are in direct contrast to statements they made during the August 16, 2023, January 31, 2024, March 4, 2024, May 1, 2024, August 21, 2024, and September 4, 2024 earnings calls and investor presentations. On those calls, the Company's executives repeatedly touted their significant demand backlog in the electronic vehicle industry, their design ins and design wins, and, significantly, their ability to execute on such demand to ramp the Mohawk Valley facility to both reach $100 million in quarterly revenue by the end of the 2024 calendar year and its eventual purported $2 billion revenue capacity, while simultaneously claiming an ability to maintain cost discipline to sustain their other facilities and plans for future development, and continually minimizing risks associated with seasonality and the potential impact of the macro environment on the Company's future profitability.

Investors and analysts reacted immediately to Wolfspeed's revelation. The price of Wolfspeed's common stock declined dramatically. From a closing market price of $13.71 per share on November 6, 2024, Wolfspeed's stock price fell to $8.33 per share on November 7, 2024, a decline of about 39.24% in the span of just a single day

A number of well-known analysts who had been following Wolfspeed lowered their price targets in response to Wolfspeed's disclosures. For example, William Blair, while reiterating their market perform rating post drop noted that "the outlook once again is well below expectations … The lack of operational progress is likely to weigh on the shares, creating a natural overhang in a name where management has lost credibility." The analyst went on to note that "Mohawk Valley has stalled in the rate of growth; by our estimate Wolfspeed is now over 30 months behind schedule. It is worth noting that Missy Stigall is no longer senior vice president of fab operations … Hopefully, this should reaccelerate the ramp of the fab. However, if the headwinds are demand related, how valuable are the design-in and design-wins?"

Similarly, J.P. Morgan, while considerably reducing their price target 15%, highlighted that Wolfspeed "management's disclosures of a worsening demand backdrop relative to EV and I&E Power Devices as well as Materials is now likely to diminish the confidence around stabilization that was starting to build with investors" that WBA is "in a bit of a downward spiral as there doesn't seem to be any type of strategy around growth with all of management's efforts focused on maintaining its retail earnings base and managing cash obligations."

The fact that these analysts, and others, discussed Wolfspeed's shortfall and below-expectation projections suggests the public placed significant weight on Wolfspeed's prior revenue and sales estimates. The frequent, in-depth discussion of Wolfspeed's guidance confirms that the above-referenced statements were material.

## DAMAGE TO THE COMPANY

### Securities Class Action

On November 15, 2024, a securities class action complaint was filed in the United States District Court for the Northern District of New York against the Company's officers. The complaint alleges violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5, in the case captioned: *Zagami v. Wolfspeed, Inc., et al.*, Case No. 6:24-cv-1395 (BKS/MJK) (N.D.N.Y.) (the "Securities Class Action").

As a result of the wrongs complained of herein, the officers and directors have subjected the Company to the significant cost of defending itself and certain of the Company's officers. The Company will continue to incur significant sums in relation to the Securities Class Actions and any liability or settlement that results.

### Additional Damage to the Company

In addition to the damages specified above, the Company will also suffer further losses in relation to any internal investigations and amounts paid to lawyers, accountants, and investigators in connection thereto.

The Company will also suffer losses in relation to the officers' and directors' failure to maintain adequate internal controls, including the expense involved with implementing and maintaining improved internal controls.

The Company has also suffered, and will continue to suffer, a loss of reputation as a direct and proximate result of the officers' and directors' misconduct which will plague the Company's share price going forward.

## INSIDER TRADING

During the wrongful course of conduct as described herein, Mr. Reynolds sold various amounts of the Company's common stock while in possession of material, non-public information regarding the Company's business, operations, and prospects, as follows:

| Insider | Date | Units | Share Price | Profit |
|---------|------|-------|-------------|--------|
| Reynolds | 12/12/2023 | 3,500 | 40.14 | 140,489 |
| | 12/19/2023 | 3,500 | 44 | 153,993 |
| | 12/26/2023 | 3,000 | 44.94 | 134,812 |

As the Company's share price was actually worth $8.33 per share, the price after the truth was revealed, Mr. Reynolds received a substantial material personal benefit from his insider trading by selling his personally held stock at inflated prices up to over five times the stock's actual value.

Although Mr. Reynolds made these sales pursuant to a 10b5-1 trading plan, they are highly suspicious (as is the timing of the adoption of the trading plan) and should be investigated because: (i) the trading plan was adopted on August 30, 2023, days after the initial false statements were made; and (ii) Mr. Reynolds had not sold any Wolfspeed stock prior to these trades nor had he adopted a trading plan prior to this August 30, 2023 trading plan.

### Shareholder Litigation Demand

By virtue of their positions as directors and/or officers of the Company and because of their ability and duty to control the business and corporate affairs of the Company, the directors and officers of Wolfspeed owe the Company and its shareholders the fiduciary duties of loyalty, due care, and candor.

As noted above, on behalf of Ms. Lamon, we demand that a full corrective action be brought, including commencing legal proceedings against each of the current and former officers,

executives and members of the Board named above, all of whom have been responsible for harming the Company as a result of the wrongdoing outlined in this letter. Claims against the disloyal directors, officers and executives should be pursued for, *inter alia*, breach of fiduciary duties, gross mismanagement, corporate waste, unjust enrichment, aiding and abetting, violations of Section 14(a) of the Exchange Act, and insider trading. The Board should also consider and implement corporate governance reforms designed to address and prevent the breaches of fiduciary duty and lack of internal controls described herein.

The action that should be brought against the above-mentioned officers and directors should seek a monetary recovery for damages that include, but are not limited to:

(a)     damage to the Company's reputation and good will (including irreparable damage to the Company's reputation and credibility);

(b)     resultant loss of business and business opportunities;

(c)     increased costs of capital; and

(d)     legal fees, costs, and potentially substantial amounts payable in settlement or satisfaction of lawsuits.

Ms. Lamon requests that he receive a response to the demand made herein promptly, and in any event no later than ninety (90) business days from receipt of this letter, as prescribed by N.C. Gen. Stat. § 55-7-42(2). Ms. Lamon is prepared to cooperate with the Board in its investigation and would be happy to have undersigned counsel meet with the members of the Board, if they would find that helpful.

To those ends, we look forward to your prompt response.

Very truly yours,

**GAINEY McKENNA & EGLESTON**

*/s/ Thomas J. McKenna*
Thomas J. McKenna

cc:     Gregory M. Egleston, Esq.
Christopher M. Brain. Esq.



GAINEY McKENNA & EGLESTON
260 MADISON AVENUE
22ND FLOOR
NEW YORK, NY 10016

Mr. Thomas H. Werner
Wolfspeed, Inc.
4600 Silicon Drive
Durham, NC 27703

PITNEY BOWES
$2.87 0
US POSTAGE
FIRST-CLASS
000WW00231999
ZIP 10017
DEC 31 2024